**William D. SHEA, Appellant,**

v.

**James E. BRUNER, Appellee.**

Court of Appeals of Kentucky.

Oct. 13, 1967.

As Modified and Rehearing Denied
April 26, 1968.

S. J. Stallings, Robert P. Hastings, Louisville, for appellant.

James G. Bowman, Hogan, Taylor, Denzer & Bennett, Louisville, for appellee.

EDWARD P. Hill, Judge.

The majority verdict of the jury was for appellee-defendant in appellant-plaintiff's suit for damages for personal injuries sustained when struck by appellee's automobile while appellant was crossing Poplar Level Road at Quarry Street in Louisville, Kentucky. The one question raised on this appeal is whether the trial court erred in refusing to give the jury a "last clear chance" instruction offered by appellant.

The question here demands a detailed statement of the facts. Poplar Level Road, a four-lane highway, runs generally north and south. Quarry Street is a two-lane street that runs into Poplar Level Road from the east and ends there. A median, sixteen feet wide, separates the two north and southbound lanes of Poplar Level Road south of Quarry Street, but north of Quarry Street the median is reduced to about four feet, partly due to a left turn storage lane for traffic desiring to turn left from Poplar Level Road onto Quarry Street.

William D. Shea, age 73 alighted from a Louisville Transit Company bus on the west side of Poplar Level Road, north of the Quarry Street intersection, late in the afternoon of February 15, 1964. It was raining. He first crossed the southbound lane of Poplar Level Road onto the narrow median (four feet wide). He stopped on the median to allow a panel truck to pass in the inside northbound lane of Poplar Level Road. In lieu of our interpretation of the facts from this point on, it is considered advisable to quote from the testimony of Shea and Bruner.

Shea explained what occurred after leaving the median in this language:

"And then I looked up to see where Mr. Bruner was and he was three hundred feet down the road, and I started on across. I knew I had plenty of time to get across and I started across. And I looked up Quarry Road to see if anything was coming, and started on across.

"And I got out to the center of the road and I looked up and he had—he slowed down. And he was almost to Quarry Road and he slowed down then, and I thought he was going to stop for me to go on. I didn't think he was coming as fast as what he was.

"And so he slowed down and I started on out, and I looked up Quarry Road. I didn't stop, I just kept on going. I never did stop from the time I started from the center. And when I looked up Quarry Road he hit me."

Appellee gave this version of the case:

"Q. Well, did you see Mr. Shea as he stood in the median in between the two roads?

"A. Not as he stood, sir.

"Q. Well, then what are you indicating that you did see him when he was at the median and—

"A. (Interrupting) When he was stepping off of the median.

"Q. Well now, when you first saw him you say he was stepping off of the median? And where were you in your car?

"A. I was some distance before—before reaching the entranceway to Quarry Center I saw him.

"Q. Well, tell us your best judgment as to how far you were from him as he stepped off that median and when you first saw him?

"A. Approximately 250 feet, something like that."

\* \* \* \* \* \*

"Q. Well, what if anything did you do when you first saw him?

"A. I taken my foot off the accelerator, placed it above the brake but I didn't apply the brake.

"Q. Well now, at the time you first saw him was he headed in an eastwardly direction?

"A. No, sir, south.

"Q. Well, he was coming facing you then?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. Then it was apparent from the time you first saw him two hundred and fifty feet away up until the time you hit him then?

"A. That he desired to cross the street, yes.

"Q. Yes, sir. Now, did you ever put your brake on?

"A. Yes.

"Q. Had you put your brake on when you first saw him 250 feet away would you have had ample time to stop?

"A. Yes.

"Q. And not struck him?

"A. Yes.

"Q. Now, from the time you first saw him until the time you hit him did you keep him in your view all the time?

"A. Yes, sir.

"Q. In other words you didn't glance off up at the Quarry, you were looking straight ahead?

"A. No.

"Q. And watching the man?

"A. I was watching the man.

"Q. And you never did see him at a standstill anywhere along the line?

"A. No, sir.

"Q. In other words he was walking from the time you first saw him go off the median and until—up until the time you struck him?

"A. No, sir. He was walking from the time I saw him come off the median and then he ran right in front of me."

The philosophy underlying the "last clear chance" doctrine was recently stated by this court in Riley v. Hornbuckle, Ky., 366 S.W.2d 304, 307 (1963):

"If it (last clear chance doctrine) is to have any real effect as a humanitarian policy, we think the doctrine must be held applicable to the situation in which (as in the Saddler case) there is evidence that a pedestrian who was within the intended path of travel of an oncoming vehicle remained in that area of peril, with nothing to prevent the driver's seeing him, long enough for the vehicle to move a distance of several hundred feet. When this occurs, there is usually a point in time at which the curtain closes on the ability of the pedestrian to get out of the way of a faster-moving vehicle while it yet remains open for the driver to shift his course. Whether that interim constitutes a 'clear' chance ought to be left to the jury."

It is the conclusion of this court that the rule announced in Riley and Frank, supra, must be invoked in this very similar factual case. Accordingly, appellant was entitled to have the jury instructed on the doctrine of "last clear chance." If upon another trial the facts are substantially the same as at the first trial, such instruction should be given.

The judgment is reversed for proceedings consistent with this opinion.

WILLIAMS, C. J., and MILLIKEN, PALMORE and STEINFELD, JJ., concur.