**Peter CASSINELLI, Appellant,**

**v.**

**Brown BEGLEY, Administrator of the Estate of Crit Begley, Appellee.**

Court of Appeals of Kentucky.

Sept. 20, 1968.

Maxewell P. Barret, Reeves, Barret & Cooper, Hazard, for appellant.

W. M. Melton, Hazard, for appellee.

JULIUS LEIBSON, Special Commissioner.

Brown Begley, as administrator of the estate of Crit Begley, his brother, recovered a $15,000 judgment against the appellant, Peter Cassinelli. Cassinelli has appealed and claims that the court erroneously overruled his motion for a directed verdict made at the close of appellee's evidence, and again at the close of all the evidence, and in overruling his motion for judgment n. o. v. It is our opinion that there was no reversible error in this regard.

■ Though numerous other claims of error were asserted by appellant in his motion for a new trial, he does not urge any of them on this appeal; furthermore, under R.C.A. 1.210(2), we may not consider any error not set forth in appellant's Statement of Questions Presented".

The accident occurred between 7:00 and 7:30 P.M., March 2, 1965, on Memorial Drive, also known as the By-pass, in Hazard, Kentucky. Memorial Drive is 40 feet wide, runs north and south, and is a two-way street. Appellee's decedent, a pedestrian, 76 or 77 years old, was struck as he was crossing from the east toward the west side at a point variously estimated from 25 to 120 feet south of the intersection. Davis Street joins Memorial Drive from the east, and Lovern Street joins Memorial Drive from the west, Lovern Street being a few feet to the north of Davis Street. Cassinelli was driving his car south on Memorial By-pass. It had been raining (but not at the time of the accident), was misty and the streets were wet. A street light located on the southwest corner was burning.

■ Appellant questions only the correctness of the trial court in overruling his motions for a directed verdict and for a judgment notwithstanding the verdict. This presents one question, because the considerations governing a proper decision on a motion for a judgment notwithstanding the verdict are exactly the same as those first presented on a motion for a directed verdict at the close of all the evidence. Clay, Kentucky Practice, CR 50.02, Comment 4, and cases therein cited.

We shall examine the evidence to determine whether there was sufficient evidence to raise an issue of fact for submission to the jury. As we stated in Lyon v. Prater, Ky., 351 S.W.2d 173: "Ordinarily, an error in denying such a motion at the close of the plaintiff's evidence is held to be cured when the defendant by his subsequent testimony has supplied the omission in the plaintiff's case." We do not mean to indicate that the plaintiff's evidence alone, in this action, was or was not sufficient to make a submissible issue.

Crit Begley, the decedent, was attending a meeting of the Fraternal Order of Police at Police Headquarters Building located on the southeast corner of Davis and Memorial By-pass. Because the Health Building on the southwest corner of Lovern and Memorial By-pass had larger quarters, it was decided to walk across to it to hold the meeting. The map filed in evidence and the testimony of several witnesses establish that the entrance of the Police Building on the east side of Memorial By-pass, out through which the decedent's witnesses and the decedent himself

came, is some distance south of the intersection, and the entrance of the Health Building on the west side of Memorial By-pass is south of the entrance to the Police Building. Tolbert Combs, Commonwealth's Attorney at Hazard, Bill Kelly, jailor of Perry County, and Sam Luttrell, Chief of Police of Hazard, testified on behalf of the decedent. Their testimony establishes that they had left the Police Building with Crit Begley and crossed Memorial Drive ahead of Crit. Neither Combs nor Kelly saw the defendant's car at any time before the impact, nor did they see Crit Begley at any time as he crossed the street or before he was hit. Luttrell testified that he saw the car hit Begley; that Begley had crossed the center of Memorial Drive, going west; that the point of impact was 40 or 50 feet south of the intersection. He measured the skid marks laid down by the car and they measured 72 feet to the point of impact, and he stated that Cassinelli had skidded "just about all the way through the intersection." (The intersection is 30 feet wide on the Davis Street side and 20 feet wide on the Lovern Street side.)

Cassinelli, the appellant, testified he was driving south on the west side of Memorial By-pass; that his headlights were on low beam and on this occasion he estimated that they "were shining about 100 feet;" that his visibility was poor, but there was nothing to obstruct his view for 100 feet in front of him. He said the first time he saw Begley was when "I noticed something come up in front of the car." Cassinelli was asked the following questions and made the following answers:

Q– "And when you came over here, there was nothing to obstruct your view, you say, for 100 feet?"

A– "That is right."

Q– "Even that night that was your guess. Now, when the pedestrian here left this side of the street, going across, was there anything to obstruct your view, to keep you from seeing him at the time you got on the street there?"

A– "Well, yes, there was."

Q– "What was that?"

A– "That X–ray Mobile Unit there."

Q– "The X-ray Mobile Unit was on this side. The pedestrian left on the Davis Street side going across toward the mobile unit, there was nothing to obstruct your view, to keep you from seeing Mr. Begley from the time he left on the Davis Street side, going over there, was there?"

A– "I didn't notice him going over there."

Q– "There was nothing to keep you from seeing him if you had been looking, was there?"

A– "I was looking, I didn't see him."

Q– "There was nothing to obstruct your view to keep you from seeing him, was there?"

A– (No answer).

Q– "What is your answer?"

A– "My answer would be that I didn't see him."

Q– "Now, at the time you came in contact with Mr. Begley up here, he had already crossed the center of the street, hadn't he?"

A– "That's right."

\* \* \* \* \* \*

Q– "What part of your car came in contact with his body?"

A– "The left hand side of the hood."

Q– "That was the front end of your car?"

A– "Yes, sir."

Q– "The front end of your car, between the center and the left headlight hit his body, is that correct?"

A– "That's right."

Q– "And what part of his body did you hit?"

A— "His right side."

\* \* \* \* \* \*

Q— "Was there any traffic coming, approaching you, at that time?"

A— "No."

\* \* \* \* \* \*

Q— "Was there anything to prevent you from cutting your car to the left, in this other lane of traffic, to avoid hitting that man?"

A— "Not if I had the time."

Q— "In other words, you had a clear view, the evidence has been introduced here, from 450 feet up here, there was nothing to keep you from having a clear view all the way down Memorial Drive at the time this happened?"

A— "Well, the only answer I can give to that is at that particular night it was misty and the windshield wipers was working, and I didn't have that clear a view at that particular night."

Q— "Do you know of any reason why you couldn't see him, or could not have discovered him, there crossing the street?"

A— "At that point, normally you don't expect anyone to cross the street at that point."

Q— "But there was nothing to obstruct your view, to keep you from seeing him crossing the street there at that point, was there?"

A— "So far as vision, not [sic]."

Q— "Did you discover him at all before you came in contact with him?"

A— "No."

Cassinelli acknowledged the correctness of the measurement of 72 feet of skid marks laid down by his car up to the point of impact.

Tolbert Combs testified that he, Bill Kelly, Don Brasheer, and others including Crit Begley, came out of the Police Building, "just taking our time. We walked out, down the step here and crossed the street. Now, when I left—This is the sidewalk here, now Crit Begley and myself, Don Brasheer and some men, came out of the door, heading more or less in a group, so I walked down here, crossed the street kind of at an angle, I would say, the best of my knowledge, at this point right here."

Combs further testified that Crit was a little behind him and to his left, and that it was about "30 seconds or 45, maybe 50" from the time he stepped up on the west sidewalk until he heard the impact. Combs was asked the following question and made the following answer:

Q— "Now, when you entered on the By-pass over here, from the Police Station, was there any cars parked, from where you entered on the By-pass, between there and Davis Street?"

A— "There wasn't any cars parked right here. I call this Memorial Drive, in front of the Police Station. Well, this area right here, but down here, as I recall there was one or two or possibly three cars parked in this area down here going toward Big Bottom, or Hazard."

Combs also testified that Crit was about "one-third of the way across that half of the street" (the west half) when he was struck.

Bill Kelly testified that the visibility was good enough that he "looked up this way and back that way to see if there was any traffic and went across," and that if any traffic had been coming he wouldn't have had any trouble observing it. Kelly testified that Crit Begley was 10 or 12 feet from the west curb when hit.

Sam Luttrell testified, "I don't know whether I heard the car slide or I thought about Crit, but anyway I turned and looked for him and the car hit him and he just flew through the air" and that "he was already across the center line. He was in the line of traffic for cars coming down the

hill" when struck; that the street light on the southwest corner was on and that there was no traffic going north at the time; that Crit had on "a suit, dark coat, dark pants, he had on dark blue, and with a light blue shirt with a little light blue, they were light or blue checks, a blue long sleeved shirt, and I think he had on a tie and he had on a light tan hat."

The foregoing is a fair summary of the evidence, there being little if any contradiction in the evidence.

In considering the sole question before us, i. e., whether the defendant was entitled to a directed verdict, the court must draw all fair and rational inferences from the evidence in favor of the plaintiff, and the evidence of such party's witnesses must be accepted as true, for the purposes of such a motion. Coms v. Peoples Bank, 313 Ky. 120, 230 S.W.2d 475; Kentucky & Indiana Terminal R. Co. v. Cantrell, 298 Ky. 743, 184 S.W.2d 111.

The evidence and reasonable inferences therefrom show that Combs, Kelly and Luttrell, as well as others, left the entrance of the Police Building on the east side of Memorial Drive together and crossed at a southwest angle toward the entrance of the Health Building, and that Crit Begley, who was 76 or 77 years old, lagged behind and was crossing the same way, thereby causing his back to be toward the northeast (the direction from which he came). Some of the witnesses testified that when they looked toward the north before starting to cross their vision was uninterrupted for 450 feet and nothing was coming; that they got over to the west sidewalk without any trouble and never at any time saw the car before the accident, except for one witness who saw it as it hit Begley, because he either had heard the car sliding and turned around, or because he turned around looking for Begley. The evidence further shows there was no marked crosswalk across Memorial Drive south of the intersection.

Begley clearly was in violation of KRS 189.570(4). We held in Chamberlain v. Wessling, Ky., 429 S.W.2d 355, that an unmarked crosswalk is an extension of the sidewalk lying across the roadway in a line between the two curb corners, and may be, under certain circumstances, held to encompass a width reasonably necessary for pedestrian travel. In any event, here the evidence clearly establishes that Begley was well out of the unmarked crosswalk. Together with the rest of the evidence, as far as Begley's activities are concerned, we are of the opinion that Begley was contributorily negligent as a matter of law.

This brings us to the question of whether there was a submissible issue under the last clear chance doctrine. The evidence and inferences most favorable to the plaintiff show that each half of Memorial Drive is 40 feet wide; that Begley was crossing at a southwest angle, having part of his back toward southbound traffic, had crossed to within 10 or 12 feet from the west curb, according to one witness, and according to another witness, had crossed one-third of the west half of Memorial Drive when struck; that Cassinelli left 72 feet of skid marks to the point of impact; that there was nothing approaching to prevent Cassinelli from turning his car to the left; that there was nothing to prevent Cassinelli from seeing Begley as he crossed from the east sidewalk; that Cassinelli did not, however, see Begley until Begley was in front of his car; that Cassinelli did nothing in the operation of his automobile except to apply his brakes. It was also established that the speed limit was 35 miles an hour. Taking into consideration the reaction time of the average person as three-fourths of a second, we know that Cassinelli must have seen Begley when his automobile was at a point three-fourths of a second north from where he started to lay down his skid marks. This indicates that Cassinelli saw Begley when his car was somewhere around 100 feet, more or less, from the point of impact, depending on the speed of his car, which was not estab-

lished. Thus it is established that Cassinelli saw Begley when his car was in the neighborhood of 100 feet from him, and if Cassinelli's testimony is to be accepted in the light most favorable to the plaintiff, which must be done, Cassinelli was 100 feet from Begley when Begley was in a position of peril. This is aside and apart from the question which reasonable men might very sensibly ask themselves and differ about under the evidence in this case. Should not Cassinelli, exercising ordinary care, have seen this 76 year-old pedestrian crossing with his back toward southbound traffic, at some point after he had crossed the center of Memorial Drive, instead of seeing him for the first time in front of his car, thus having seen him when his car was much further back from the point of impact than around 100 feet, and thus have had even more opportunity to avoid striking him? Under the evidence in this case we conclude that it was clearly a jury question to decide whether or not the defendant exercising ordinary care should have discovered the decedent's peril at such a time that with the means at his command he could have avoided striking him.

Adhering to the concept of the last clear chance doctrine given expression in such recent cases as Riley v. Hornbuckle, Ky., 366 S.W.2d 304; Fenwick v. Daugherty, Ky., 418 S.W.2d 243; Shea v. Bruner, Ky., 426 S.W.2d 482; French v. Mozzali, Ky., 433 S.W.2d 122 (decided March 8, 1968), and Marshall v. Merrifield, Ky., 431 S.W.2d 870 (decided today) we are of the opinion that the evidence was sufficient to make a submissible issue under the last clear chance doctrine, and hence, the court below properly overruled the defendant's motion for a directed verdict and for a judgment notwithstanding the verdict. Since that is the only question before us on this appeal, and since the appellant has not asserted any other errors, the judgment is affirmed.

All concur.