RENDERED: JANUARY 30, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0572-MR

METROPOLITAN LIFE INSURANCE
COMPANY                                                                    APPELLANT


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE ERIC J. HANER, JUDGE
                    ACTION NO. 13-CI-005835


WILLIAM GRUNDY                                                             APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: CALDWELL, MCNEILL, AND TAYLOR, JUDGES.

TAYLOR, JUDGE: Metropolitan Life Insurance Company (MetLife) brings this

appeal from an Opinion and Order entered April 11, 2023, by the Jefferson Circuit

Court denying MetLife's Kentucky Rules of Civil Procedure (CR) 50.02 motion.[1]

For the reasons stated, we reverse and remand.

---

[1] Metropolitan Life Insurance Company (MetLife) was seeking a judgment notwithstanding the verdict or a new trial in response to the Amended Judgment entered by the circuit court on November 7, 2022.

# BACKGROUND

This is a complicated case with an enormous record consuming over 7,500 pages. The case is on its third trip to this Court. In the interest of judicial economy, we shall discuss only the most relevant underlying facts and events in this case's voluminous history.

William Grundy was an employee of the American Red Cross (Red Cross) in Louisville for approximately twenty-two years. Part of his compensation package included short-term disability (STD) benefits. MetLife was a third-party administrator who entered into a contract with Red Cross to administer the STD benefits plan. Under the STD plan, Grundy was entitled to twenty-six weeks of STD benefits. In November of 2012, due primarily to depression, Grundy applied for and received STD benefits when he became unable to perform his job duties for Red Cross. In February of 2013, after paying approximately half (13 weeks) of Grundy's STD benefits, Red Cross terminated his STD payments at the direction of MetLife, presumably on the premise that Grundy was no longer disabled. The genesis of this case is Grundy's assertion that MetLife wrongfully terminated his STD benefits. The unpaid STD benefits totaled $13,061.81.

Grundy initiated this action in November of 2013 against MetLife.[2] The complaint contained four relevant state law claims: tortious interference with

---

[2] Red Cross was not a named party in William Grundy's lawsuit.

contract, violation of the Unfair Claims Settlement Practices Act (UCSPA), breach of the duty to act in good faith, and violation of the Kentucky Consumer Protection Act (CPA).[3] Relevant to this appeal, there were no claims asserted by Grundy for long-term disability (LTD) benefits which were also provided to employees of Red Cross through MetLife. However, in paragraphs 44 – 46 of the complaint, Grundy alleged that the STD payments were terminated to deter Grundy from filing an LTD claim.

Also, in the complaint, Grundy referenced a letter terminating Grundy's STD payments received from MetLife in March of 2013. Grundy alleged that MetLife stated in the letter that the STD benefits plan was subject to the Employee Retirement Income Security Act (ERISA), 29 United States Code (U.S.C.) §1001 *et seq.* However, in paragraphs 36, 37, and 38 of the complaint, Grundy asserted that ERISA did not apply to the Red Cross plan and MetLife had misrepresented this fact to Grundy to hinder his hiring of counsel to pursue a claim. Those assertions are relevant because ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. §1144(a); *see also* C.J.S. *Pensions* §16 (2025). For example, ERISA preempts claims for a violation of Kentucky's unfair claims settlement

---

[3] Grundy also asserted a negligence *per se* claim which was dismissed before trial, a decision not challenged in this appeal.

practices laws and Consumer Protection Act. *Howard v. Prudential Insurance Company of America*, 248 F.Supp. 3d 862, 867 (W.D. Ky. 2017); *Curry v. Cincinnati Equitable Ins. Co.*, 834 S.W.2d 701, 706 (Ky. App. 1992).

Grundy's complaint specifically asserted his claims were not preempted by ERISA because the plan at issue was part of a payroll practice by Red Cross. The Sixth Circuit has explained that "[u]nder the Department of Labor's regulations, . . . 'normal compensation' paid to an employee as a result of a disability and from 'the employer's general assets' does not constitute an employee welfare benefit plan, but instead is considered a 'payroll practice.' . . . Such practices are not regulated by ERISA." *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 479 (6th Cir. 2007) (quoting *Abella v. W.A. Foote Mem'l Hosp.*, 740 F.2d 4, 5 (6th Cir. 1984)); *see also Schwartz v. Liberty Life Assur. Co. of Boston*, 470 F.Supp. 2d 511, 515 (E.D. Pa. 2007) ("ERISA broadly regulates . . . short term disability benefits; however, the Secretary of Labor has promulgated a carve-out exception. Thus, an employee benefit plan which falls within what the Department of Labor . . . refers to as 'payroll practices' is exempt from governance under ERISA.").

Apparently, due to an error or mistake by in-house counsel, MetLife did not timely file an answer to the complaint and failed to timely raise the ERISA preemption defense before the trial court. On July 9, 2014, the trial court entered a

-4-

default judgment for liability against MetLife on behalf of Grundy. On October 8, 2014, upon motion by Grundy, the trial court entered a default judgment against MetLife for damages in the amount requested by Grundy, which included $1,191,760 in compensatory damages, $4,767,040 in punitive damages and $417,116 for attorney's fees, totaling approximately $6.4 million.[4]

On October 7, 2015, almost a year after the damages judgment was entered, MetLife moved the trial court to set aside the judgment pursuant to CR 55.01 and CR 60.02. MetLife admitted Grundy was entitled to a default judgment but argued Grundy's state law claims were preempted by ERISA.

On August 15, 2016, the trial court denied MetLife's motion. The court held that MetLife had forfeited any potential meritorious affirmative defenses by not responding to Grundy's complaint. MetLife immediately filed a motion to alter, amend, or vacate under CR 59.05, or, alternatively, for relief under CR 60.02(f). While that motion was still pending, on September 13, 2016, MetLife filed an appeal to this Court. *Metropolitan Life Insurance Company v. Grundy*, Appeal No. 2016-CA-1350-MR ("*Grundy I*"). We stayed *Grundy I* to allow the trial court to rule on MetLife's CR 59.05 and 60.02(f) motion.

---

[4] The compensatory damage award included $13,061.81, plus accrued interest, for Grundy's short-term disability (STD) benefits owed by MetLife.

On October 4, 2017, almost four years after the complaint was filed, the trial court granted MetLife's motion and vacated the damages award in part on the premise that the court had awarded unliquidated damages under CR 55 without conducting an evidentiary hearing.[5]  On October 20, 2017, Grundy filed an appeal. *Grundy v. Metropolitan Life Insurance Company*, No. 2017-CA-1700-MR, 2019 WL 5490984, at *4 (Ky. App. Oct. 25, 2019), *discretionary review denied* (Jul. 1, 2020) (*Grundy II*).  In 2018, we dismissed *Grundy I* as being interlocutory.  *See Grundy II*, 2019 WL 5490984, at *1.

By Opinion rendered on October 25, 2019, a panel of this Court in *Grundy II* affirmed the trial court's decision to vacate the damages awarded as set out in its October 8, 2017, order.  We held that "unliquidated damages must be supported by competent evidence" but the damages awarded to Grundy were not "connected in any way to any evidence." *Id.* at *3.  We further held:

> It is well established that "[n]otwithstanding that a default judgment has been entered, the law still requires a legal basis to support a damages claim[.]" *Deskins v. Estep*, 314 S.W.3d 300, 304 (Ky. App. 2010).  This case is similar to *Deskins* in that "the record in this case fails to support the damage award" and a:

---

[5] The STD benefits award in the amount of $13,061.81, plus accrued interest, remained intact and was subsequently paid by MetLife.  In 2021, MetLife deposited funds into court sufficient to cover the judgment plus accrued interest.  The judgment for STD benefits is not an issue on appeal.  Accordingly, this Court has declined to address MetLife's argument on appeal regarding the failure of Grundy to introduce the STD benefits plan into evidence at trial.

> review of the record reveals absolutely no evidence that addresses the accurate measure of damages as required in this case. On remand, the circuit court is instructed to identify the existence of any construction agreements and their terms, and then apply the proper measure of damages to determine what damages, if any, have arisen from the alleged breach of the construction contract at issue in this litigation.
>
> *Id.* at 304, 305.  In neither *Deskins* nor the case at hand was a copy of the contract or contracts at issue submitted prior to entry of judgment awarding damages.  This is the most basic and essential element in determining whether, and how, Grundy is entitled to relief in this matter.
>
> . . . .
>
> Absolutely no rationale or supporting documentation was provided to explain the calculation of damages.  This is wholly insufficient to support a judgment on damages, particularly when the amounts appear to be grossly inflated and duplicative.  *Id.* at 305 . . . .

*Id.* at *3-4.  As noted, the Kentucky Supreme Court denied discretionary review by Order entered on July 1, 2020.

On remand, a four-day jury trial was conducted by the trial court on October 24-27, 2022, on the damages issue.  Prior to trial, MetLife moved for partial summary judgment, again arguing ERISA preempted Grundy's state law claims.  The court denied the motion, noting that while MetLife had presented evidence supporting its claim that ERISA did apply to the Red Cross STD benefits

-7-

plan, MetLife's default constituted an admission that ERISA did not apply, based on Grundy's allegations in the complaint. At the conclusion of trial, the jury awarded Grundy $1,625,000 for emotional distress damages and $5,500,000 in punitive damages, for a total of $7,125,000. After the trial court denied MetLife's post-trial motions, this appeal followed. (*Grundy III*). Additional facts will be provided as necessary in our analysis.

## STANDARD OF REVIEW

Given the complexity of this case, including the establishment of liability by default, our standard of review as concerns the issues arising from the jury trial on damages is varied. First, our review of the denial of a motion for directed verdict at the close of the proof and a motion for judgment notwithstanding the verdict are the same. *Cassinelli v. Begley*, 433 S.W.2d 651, 652 (Ky. 1968). Our role is to "examine the evidence to determine whether there was sufficient evidence to raise an issue of fact for submission to the jury." *Id.* Stated differently, "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt [or liability], only then the defendant is entitled to a directed verdict[.]" *Mountain Water Dist. v. Smith*, 314 S.W.3d 312, 314 (Ky. App. 2010) (quoting *Commonwealth v Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). The evidence and reasonable inferences therefrom must be construed in a light

most favorable to the nonmoving party. *Radioshack Corp. v. Comsmart, Inc.*, 222 S.W.3d 256, 261 (Ky. App. 2007).

Second, we review a trial court's denial of a motion for mistrial for an abuse of discretion. *Oghia v. Hollan*, 363 S.W.3d 30, 32-33 (Ky. App. 2012). An abuse of discretion means the trial court acted "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

Third, as concerns the trial court's evidentiary rulings, our review also looks to an abuse of discretion. *Engles v. Commonwealth*, 373 S.W.3d 456, 457 (Ky. App. 2012). This would also include the improper application or interpretation of the Kentucky Rules of Evidence (KRE).

Fourth, we review alleged errors in jury instructions *de novo*. *Carmical v. Bullock*, 251 S.W.3d 324, 328 (Ky. App. 2007). An erroneous instruction is presumed to be prejudicial whereupon the burden is upon an appellee to establish from the record that no prejudice was created by the instruction. *Drury v. Spalding*, 812 S.W.2d 713, 717 (Ky. 1991).

Fifth, as concerns punitive damages, presuming that jury instructions comply with the law, we review the constitutionality of punitive damages *de novo*. *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 298 (Ky. App. 2009). An award of punitive damages is in violation of the Fourteenth Amendment's due process

clause if the award is "grossly excessive." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996).

With these standards in mind, our review proceeds accordingly.

**ANALYSIS**

I. MISTRIAL/DIRECTED VERDICT/JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)

On October 21, 2022, three days before the trial began, the trial court entered an order, granting in part, MetLife's motion *in limine*, to exclude certain evidence from trial. Specifically, Paragraph 7 of the Order read:

> MetLife's motions *in limine* to exclude evidence relating to litigation conduct and/or any evidence suggesting that MetLife is the cause or is to blame for the length of litigation after MetLife entered their appearance in this case is **GRANTED**.

Record at 5574-75.

MetLife asserted that Grundy was attempting to have MetLife punished for the length of time to get the case to trial – almost nine years – to embellish Grundy's damages claim. As noted, the trial court excluded any evidence by Grundy to place blame on MetLife for the length of the litigation.

However, notwithstanding the trial court's order, counsel for Grundy, during Grundy's opening statement to the jury, referenced the nine years of litigation as a basis for imposing damages on ten or more occasions. At one point, counsel even asserted Grundy was entitled to nine million dollars in punitive

-10-

damages for each of the nine years of litigation. Video Record (VR) 10/25/22, 10:04:12-15. While counsel for MetLife objected several times, some of the objections were sustained by the court but the jury was not admonished nor was an admonishing instruction given at the end of the trial.

In the trial court's April 11, 2023, Opinion and Order, denying various post-trial motions, the court specifically stated that the court "gave admonitions when requested." Record at 6755. However, the trial video record reflects otherwise as the trial court denied all of MetLife's requests for admonitions during counsel's opening statement for Grundy, other than finally giving a specific admonishment to Grundy's counsel, out of the jury's presence, to cease all references to the nine-year length of the case. VR 10/25/22, 10:27:40-10:28:10. On three occasions during trial, Grundy's witnesses' testimony referenced the nine-year period of the litigation, including Grundy, for which the trial court sustained an objection and admonished the jury to disregard the answers given by the witnesses.

However, the damage was done. Counsel for Grundy ignored the court order entered three days before trial that precluded placing blame on MetLife for the length of the litigation. Grundy's counsel persisted throughout his opening statement to equate Grundy's damage claim to the length of the litigation, going so far as to assert MetLife had engaged in nine years of misconduct towards Grundy.

VR 10/25/22, 10:04:19-25. When the trial court refused to admonish the jury regarding counsel's blatant violation of the *in limine* order, MetLife also moved for a mistrial, directed verdict, and JNOV based in part on the numerous violations. The trial court denied all of MetLife's motions, including a request for an admonition instruction in the jury instructions.

The Kentucky Supreme Court has held:

> It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way. . . .

*Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996).

We readily acknowledge an opening statement by counsel is not evidence. *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017). And, prior to Grundy's opening statement, the trial court advised the jury that counsel's statement was not evidence. However, as noted in *Jefferson*, counsel's latitude in his opening presentation is not limitless and "a party should avoid discussing matters that are not admissible." *Id.* at 338. In this case, per the *in limine* order entered three days before trial, any reference to litigation conduct and evidence that MetLife was to blame for the length of the litigation was expressly excluded from the trial. Regardless, Grundy's counsel proceeded to argue that MetLife's alleged

misconduct continued throughout the nine-year history of the litigation. And, the trial court declined to admonish the jury on this issue, despite several requests by MetLife.

Based on our review of the trial video record, we believe the trial court erred and otherwise abused its discretion in not granting a mistrial. Substantial prejudice occurred to MetLife as a result of the violation of the *in limine* order, which clearly is reflected in the award of damages, which are grossly excessive and will be addressed separately. To be entitled to a mistrial, there must occur during trial a "fundamental defect," and it "must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way." *Gould*, 929 S.W.2d at 738. Without a proper admonition by the trial court, MetLife was unable to obtain a fair and impartial trial in this case, which resulted in a manifestly unjust jury verdict.

For this reason alone, MetLife is entitled to a new trial. However, the errors at trial did not end at the opening statement. Additional reasons for reversing and remanding the court's judgment exist as concerns the damages awarded which will be addressed separately to provide guidance to the court and parties for the next trial. These errors also warranted a mistrial. Because we are remanding for a new trial, we decline to address the court's failure to grant a directed verdict or JNOV.

## II. EMOTIONAL DISTRESS DAMAGES

As previously discussed, MetLife's default as to liability in this case legally constituted an admission for violating the UCSPA and CPA. This default also constituted an admission that MetLife acted in bad faith in terminating Grundy's STD benefits. As Grundy correctly points out in his argument to this Court, emotional distress damages are recoverable in Kentucky for statutory bad faith claims. *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 39 (Ky. 2017).

*Demetre*, like this case, looks to bad faith conduct under the UCSPA for emotional distress damages. In *Demetre*, 527 S.W.3d 12, the Supreme Court stated:

> It is a bad faith case and Kentucky has long recognized that "damages for anxiety and mental anguish are recoverable in an action for statutory bad faith" provided there is "clear and satisfactory" evidence from which "the jury could infer that anxiety or mental anguish in fact occurred." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1997).

*Id.* at 39.

As concerns damages, *Demetre*, 527 S.W.3d at 39, also directs our review to the facts of the case to determine whether there was "clear and satisfactory" proof presented at trial to support Grundy's recovery of emotional distress damages. We do not believe requiring clear and satisfactory proof of damages is subject to the limitations set by the default judgment for liability and is

-14-

consistent with our holding in *Deskins v. Estep*, 314 S.W.3d 300, 304 (Ky. App. 2010) that evidence must be presented in an evidentiary proceeding to prove the damage claim.

Based on our review of the proof presented at trial, the evidence was not clear and satisfactory to warrant a verdict for $1,625,000 nor was the jury instruction for emotional distress damages proper under *Demetre*. Effectively, the verdict bears no relationship to the admissible evidence presented in this case. *See Asbury Univ. v. Powell*, 486 S.W.3d 246, 264 (Ky. 2016). Our reasoning follows.

To begin, we note that MetLife raises a legitimate argument that Grundy's claim for emotional distress damages fails because Grundy's alleged injuries were not severe or serious as required by *Osborne v. Keeney*, 399 S.W.3d 1, 17-18 (Ky. 2012). Clearly, the jury instruction did not address this requirement. Grundy counters that *Demetre* expressly rejected this requirement in bad faith cases, citing *Demetre*, 527 S.W.3d at 40 n.30. While this issue does appear to need clarification from the Supreme Court, we need not address it here where the evidence presented at trial was not clear and satisfactory to support the emotional distress damages verdict in this case.

At trial, Grundy testified on direct examination for approximately 23 minutes. Most of his direct examination addressed his prior health issues from 2005-2012, that included, heart disease, chronic back pain, high blood pressure,

anxiety and depression, which as discussed, was the basis for his STD benefit claim in November of 2012. He further testified that he had experienced depression from the loss of family members. More relevant to this appeal, Grundy testified that he suffered stress, worry, and anxiety based on MetLife terminating his short-term disability benefits in 2013. VR 10/25/22, 12:15:12-31. On cross-examination, Grundy admitted that he had no medical problems after February of 2013 that could be attributable to MetLife and that his depression was managed by medicine prescribed by his doctors. In his own words, he testified, "I'm fine." VR 10/25/22, 11:42:00-11:42:30.

Grundy admitted during his testimony that after receiving the letter terminating his STD benefits in March of 2013, he worried about paying his bills. However, he also testified that he was receiving at that time a Veterans Administration pension, that he received a pension from Red Cross upon his retirement in May of 2013, and in November of 2013, he began receiving Social Security Disability benefits. In other words, any short-term financial stress or anxiety over the loss of $13,061.82 of STD benefits would clearly be limited to the calendar year of 2013, as Grundy initiated this action in November of 2013. Other than for the year 2013, Grundy gave no testimony on how his purported emotional distress affected his everyday life. In fact, he testified he had no resulting medical issues or economic loss after 2013. VR 10/25/22, 12:10:10-25. No attending

-16-

physicians or family members testified regarding Grundy's emotional distress. And, there was no evidence of any adverse impact, including medical treatment, on Grundy due to the termination of STD benefits after 2013. Based on the evidence, including the repeated references to the nine years of litigation, any stress suffered after 2013 would look to the stress of the litigation, including the duration of the litigation, which is not attributable to the actions of MetLife. Based on our review of Kentucky jurisprudence, we can find no legal authority that authorizes compensation for a plaintiff's emotional distress arising from litigation stress or anxiety. We are also cognizant that Grundy, not MetLife, initiated this lawsuit. And, merely alleging that one has suffered stress, worry or anxiety, absent nothing more, is not enough to support a damages claim for emotional distress. *Cf. Demetre*, 527 S.W.3d at 39-40.[6]

Our decision is further buttressed by the testimony of Dr. Sharon Voor, a clinical psychologist called by Grundy as an expert witness at trial. In *Demetre*, the Supreme Court held that in actions for statutory bad faith, expert testimony was not necessary to establish emotional distress damages. *Demetre*, 527 S.W.3d at 39. Notwithstanding, Grundy called Voor in an attempt to bolster his testimony to support his damages claim.

---

[6] Other than Grundy and Dr. Sharon Voor, no other physicians, counselors, family members, etc., were called as witnesses in support of Grundy's emotional distress claim.

Voor interviewed Grundy for the first and only time in April of 2022, a few months before trial. She had not previously treated him for depression or emotional distress. Besides the interview, she administered various aptitude tests, including the Minnesota Multiphasic Personality Inventory and reviewed his medical records for the period of 2012-2013. She did not examine any psychological or medical records for the period of 2014-2022, nor were any such records entered into evidence at trial. In her opinion, Grundy was not depressed nor was he suffering any post-traumatic stress disorder. She further concluded that Grundy had no diagnosable permanent psychological impairment or mental health problem in April of 2022. Dr. Voor acknowledged that her review of any psychological stress by Grundy was limited to the period of 2012-2013 and testified that any stress or worry by Grundy was exacerbated by MetLife during this period of time only. Voor did not give any testimony or opinion regarding the purported emotional distress suffered by Grundy for the period of 2014-2022. Voor's testimony reaffirms that the only substantive, admissible evidence regarding Grundy's alleged emotional distress claim looks to 2013 and nothing more.

Given the limited evidence of emotional distress damages presented by Grundy during his testimony and his expert, Dr. Voor, the jury instruction was erroneous and seriously prejudicial to MetLife. The instruction read as follows:

INSTRUCTION 2
COMPENSATORY DAMAGES

The Court has determined that the Plaintiff is entitled to recover $13,061.86 in unpaid short-term disability benefits from the Defendant.

You will now determine from the evidence and award any additional amount of money damages that will fairly and reasonably compensate the Plaintiff for any emotional distress that you believe from the evidence the Plaintiff has sustained as a direct result of the Defendant's termination of his short-term disability benefits, not to exceed $15,885,000.00

Record at 6263-64.

This instruction is flawed for three reasons. First, the instruction does not state the standard or a quantum of proof necessary to support an award of emotional distress damages as set out in *Demetre*, 527 S.W.3d at 39. As discussed, that standard requires the introduction of "clear and satisfactory proof" to support Grundy's emotional distress damage claim. *Id.* The instruction as written, effectively awarded Grundy default damages for emotional distress which is clearly an error of law. *See Deskins*, 314 S.W.3d at 304.[7]

---

[7] The arguments presented by the dissent focuses upon the evidence to support the default judgment for liability – the allegations of the complaint – rather than competent evidence to support a claim for emotional distress damages as required by law and the mandate of this Court as set out in *Grundy II*. As the Supreme Court stated in *Community Financial Services Bank v. Stamper*, 586 S.W.3d 737, 740-41 (Ky. 1991), "judges and justices are presumed to know the law and are charged with its proper application." (Citing *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 930 (Ky. 2002)). The Court went on to state that "applicable legal authority is not evidence and can be resorted to at any stage of the proceedings whether cited by the litigants or simply applied, *sua sponte*, by the adjudicator." *Id.* at 741 (quoting *Burton*, 72 S.W.3d at 730)).

-19-

Second, based on the evidence presented at trial, the only period of time in which Grundy could claim compensable emotional distress damages was during 2013. The only evidence regarding emotional distress damages from 2014-2022 looked to Grundy's alleged stress from nine years of litigation, which is not compensable in Kentucky. On remand, the emotional distress damages claim shall be limited for 2013 only.

Third, and the most egregious error in the instruction, is that the "not to exceed" limitation of $15,885,000 in damages is not supported by the evidence and was blatantly prejudicial to MetLife.

This Court recognizes that "not to exceed" amounts are commonly used in jury instructions to reflect the plaintiff's last-stated claim for unliquidated damages. *See Fratzke v. Murphy*, 12 S.W.3d 269, 271 (Ky. 1991). That occurred in this case. Instructions including "not to exceed" amounts are a holdover from the Code of Practice in Civil Cases (Civil Code), which governed Kentucky Trial Courts for 100 years until replaced by the Rules of Civil Procedure in 1953. Under the Civil Code, a claimant was required to state amounts of damages sought in the initial pleading. Civil Code §90; *see Bringardner Lumber Co. v. Middleton*, 124

---

The circuit court's reading of the allegations of the complaint to the jury to support an unliquidated damages claim is not competent evidence and was otherwise an error of law. "When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law." *Stamper*, 586 S.W.3d at 741.

S.W.2d 52, 53 (Ky. 1939). Traditionally, the trial court would then instruct the jury about the amount claimed. Today, claimants are not even allowed to state amounts for unliquidated damages in the initial complaint. CR 8.01(2). Apparently out of habit, our courts have held on to the practice of giving juries "not to exceed" numbers under the guise of CR 8.01(2). But that rule says nothing about jury instructions; it rather limits recovery by way of interrogatory answers regardless of what a jury may award.[8]

Based on our review of applicable rules and law, there is no requirement in Kentucky that trial courts include "not to exceed" amounts for damages claims in jury instructions. Jury instructions are the last word given by the trial court to the jury before the jury begins deliberations. The practice of including "not to exceed amounts" in the instructions could easily mislead a jury to the extent that it implies a trial court endorses a verdict up to a specified amount, especially in a case like this where liability is established by default. Effectively, the trial court is commenting upon the sufficiency of the damages evidence, which prohibits a fair and impartial verdict from being rendered. In this case, the trial

---

[8] We are cognizant that MetLife did not raise a specific objection to Grundy's *Fratzke* damages claim amount in the final jury instructions. However, MetLife did generally object to the final instructions as presented. Regardless, longstanding appellate precedent provides that so long as an appellate court confines its review to the record on appeal, no rule of court or constitutional authority precludes this Court from deciding an issue not presented on appeal by the parties. *Priestly v. Priestly*, 949 S.W.2d 594, 596 (Ky. 1997) (citing *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky. 1991)).

court did not explain why this amount was the maximum that could be awarded. There was no evidence, other than counsel's opening statement, to support this amount of damages.[9] Thus, by signaling the court's acquiescence to the jury that emotional distress damages up to the amount of $15,885,000 for the termination of STD benefits totaling $13,061.81 was permissible, the instruction on its face was erroneous and prejudicial to MetLife. The problem was compounded by the instruction granting damages without stating the standard of proof necessary to sustain an emotional distress damages claim. When this Court cannot determine from a record on appeal that a verdict was not influenced by an erroneous instruction, then the judgment must be reversed. *Drury,* 812 S.W.2d at 717. Therefore, the award of $1,625,000 for mental anguish damages was excessive and not supported by the evidence.

In summation, on remand at the new trial, the trial court will limit any claims for emotional distress damages to the year of 2013 only. Additionally, any jury instruction for emotional distress damages shall provide that damages may only be awarded upon clear and satisfactory proof to support recovery thereof.

---

[9] Counsel for Grundy actually asked for 5.67 million dollars for emotional distress damages during his opening statement. Video Record (VR) 10/25/22, 10:04:02. During Grundy's testimony, on direct examination, he was asked by his counsel how much in emotional distress damages he was seeking. His response was "whatever they think is reasonable." VR 10/25/22, 11:46:30-11:46:50. As noted, counsel's opening testimony was not evidence.

Finally, the jury instruction shall not include a "not to exceed" amount that is not supported by the evidence presented or preferably, no amount should be stated.

III. PUNITIVE DAMAGES

As noted, the jury awarded Grundy 5.5 million dollars in punitive damages. In Kentucky, punitive damages are permitted to punish one for a wrongful act and discourage similar conduct in the future. Kentucky Revised Statutes (KRS) 411.184(1)(f); *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky. 1974). However, a punitive damages award "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).

In this case, MetLife's liability was established by default, resulting in an admission of bad faith and reckless conduct in terminating Grundy's STD benefits. Under these facts, Grundy was entitled to a punitive damage award instruction. *Wittmer v. Jones*, 864 S.W.2d 885, 891 (Ky. 1993). Notwithstanding, even where a default judgment for liability has been established, the award of punitive damages must be reasonable and comport to the guidelines set out by the United States Supreme Court. Those guidelines were plainly stated in *State Farm* as follows:

> [T]he most important indicium of the reasonableness of a
> punitive damages award is the degree of reprehensibility
> of the defendant's conduct. We have instructed courts to
> determine the reprehensibility of a defendant by

-23-

considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. . . .

*State Farm*, 538 U.S. at 419 (citations omitted).

In applying these guidelines, the degree of MetLife's reprehensibility is unknown because of the default judgment and the jury was given only MetLife's admission that it acted in bad faith and had no reasonable basis for terminating the remaining thirteen weeks of Grundy's STD benefits. Given this admission, there was no evidence of physical harm to Grundy and as noted, the emotional distress damages evidence was not clear and satisfactory to support a claim except as concerned the year 2013. There was certainly no evidence that others were treated in similar fashion by MetLife or that the conduct was repeated. The only evidence presented that distorted the claim for punitive damages was the testimony of Elliott Flood and Sara Ford in regard to the LTD policy which will be addressed below. These witnesses were qualified as experts on behalf of Grundy.[10] For the reasons

---

[10] MetLife made continuing objections to the testimony of both Elliott Flood and Sara Ford.

that follow, the punitive damage instruction was flawed and we conclude the punitive damage award was excessive and unconstitutional.

Before addressing the expert testimony, we must address the underlying authority for assessing the amount of punitive damages in Kentucky. In 1988, the Kentucky General Assembly enacted KRS 411.186 regarding the assessment of punitive damages. Therein, subsection (2) reads:

> (2) If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then assess the sum of punitive damages. In determining the amount of punitive damages to be assessed, the trier of fact should consider the following factors:
>
> (a) The likelihood at the relevant time that serious harm would arise from the defendant's misconduct;
>
> (b) The degree of the defendant's awareness of that likelihood;
>
> (c) The profitability of the misconduct to the defendant;
>
> (d) The duration of the misconduct and any concealment of it by the defendant; and
>
> (e) Any actions by the defendant to remedy the misconduct once it became known to the defendant.

The jury instruction in this case included subsection (2)(a)-(d). Of particular relevance to this case is (2)(c) regarding the profitability of the misconduct to MetLife. Over MetLife's objection to the testimony of both experts, the trial court allowed both experts to testify, who outrageously distorted the amount of profit

reaped by MetLife in terminating the remaining $13,061.81 of STD benefits owed to Grundy.

Both experts testimony focused on the LTD benefits plan provided by Red Cross. Significantly, there were no claims set out in Grundy's complaint for LTD benefits and no evidence was presented that Grundy sought LTD benefits before retiring in May of 2013. However, the complaint asserted that one of the reasons the STD benefits were terminated by MetLife was to dissuade Grundy from filing an LTD claim. Complaint at 5, Paragraphs 45 and 46. Accordingly, Grundy's experts were retained to testify how profitable his termination was to MetLife to satisfy KRS 411.186(2)(c).

Elliott Flood, a Texas lawyer and CPA, testified first. Flood worked as an internal auditor with a Texas workers' compensation insurance company for fourteen years before becoming a litigation consultant and expert witness. He admitted he had no experience adjusting STD claims. Flood testified that based on an industry study, the payment of STD benefits by insurance companies had an effect on their subsequent payment of LTD benefits. That study was conducted by a claims analytics data company for several national insurance companies, including MetLife. No specific data, stats or identity of the companies was revealed and the purpose of the study was to establish benchmarks for the companies using anonymous peer data. The study apparently suggested that a 1

percent decrease in STD claims could save millions of dollars in LTD claims for the companies.

Using this data, Flood did a population extrapolation in conjunction with MetLife's national STD claims data supplied during discovery to determine that MetLife had approximately 3,000 STD claims in Kentucky in 2013. And without any foundation or evidentiary nexus to Grundy, Flood testified that upon termination of 1 percent of those STD claims or 30 claims in 2013, MetLife would save from 9 to 18 million dollars on the payment of LTD claims in 2013. He utilized a $625,000 valuation of Grundy's LTD benefit prepared by Ford to create an average profitability value to MetLife for each of the 30 hypothetical LTD claims that MetLife would not have to pay.[11]

> KRE 702 provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the proponent demonstrates to the court that it is more likely than not that:
>
> (1) The testimony is based upon sufficient facts or data;

---

[11] Flood testified that Ford's valuation of $625,000 was based on Grundy's wage at $32 an hour. For the other twenty-nine hypothetical claimants, he assumed a lower wage than Grundy's to project a profitability range of $300,000 to $600,000 per claimant, thus providing the annual savings of 9 to 18 million dollars per year to MetLife based on termination of thirty STD claims.

(2) The testimony is the product of reliable principles and methods; and

(3) The witness' opinion reflects a reliable application of the principles and methods to the facts of the case.

The Kentucky Supreme Court has clarified that expert opinion testimony is admissible provided:

(1) [T]he witness is qualified to render an opinion on the subject matter, (2) the subject matter satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), (3) the subject matter satisfies the test of relevancy set forth in KRE 401, subject to the balancing of probativeness against prejudice required by KRE 403, and (4) the opinion will assist the trier of fact per KRE 702.

*Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997); *see also Brosnan v. Brosnan*, 359 S.W.3d 480, 484 (Ky. App. 2012).

KRE 402 provides that, with some exceptions, all relevant evidence is admissible. *See also* Robert G. Lawson, *The Kentucky Evidence Law Handbook*, §2.10 (2024 ed.). KRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probably than it would be without the evidence." Relevant evidence may, nevertheless, be inadmissible "if its probative value is substantially outweighed by the danger of undue prejudice,

-28-

confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

The admission of Flood's testimony regarding unknown LTD claims was an abuse of discretion and error of law by the trial court. This testimony had no relevance to Grundy's claim. The only claim asserted in this case dealt with Grundy's STD benefits. The case is not a class action and there were no other claimants identified during the trial. There is not one shred of evidence in the record on appeal to establish there were twenty-nine other claimants in Kentucky who lost LTD benefits through termination of STD benefits – the evidence does not even establish that Grundy lost LTD benefits. Likewise, MetLife made no admission by default that 29 other employees' STD benefits were wrongfully terminated in 2013. MetLife made no admission during trial that Grundy or any other employee lost LTD benefits in 2013 after having their STD benefits terminated. Flood's testimony is based totally on speculation, conjecture and innuendo at best about unknown claims that are not relevant to the STD claim asserted by Grundy in this case. Flood's testimony regarding millions of dollars in profits to MetLife for unknown LTD claimants was unduly prejudicial and presumably formed the basis for the *Fratzke* punitive damage claim of $115,000,000. The prejudicial effect of this testimony outweighed any probative value as concerns the profitability of MetLife terminating Grundy's STD benefits.

On retrial, no testimony shall be allowed regarding other LTD claimants as those persons are not parties to this action. If the trial court allows a punitive damage instruction, evidence regarding KRS 411.186(2) shall be limited to profit, if any, that MetLife may have gained from Grundy's LTD benefits only, assuming the evidence establishes that those benefits were wrongfully denied.

As concerns Sara Ford, a vocational economist who testified on the present value of Grundy's LTD benefits, her testimony had similar flaws. First, she testified about Grundy's LTD insurance policy which was not entered into evidence at trial. Since this policy is Grundy's primary evidence to establish profitability by MetLife's bad faith conduct to award punitive damages, this policy should have been entered into evidence in accordance with *Deskins*, 314 S.W.3d at 304. And for purposes of establishing MetLife's profit based on Grundy's LTD policy, that profit must reflect all terms and conditions of the policy including any setoffs, deductions, etc. Ford acknowledged that Grundy was only eligible in 2013 for sixty-one and one-half months of LTD benefits, if he qualified. The benefit was 60 percent of his salary subject to various conditions and limitations. Over $400,000 of her valuation was interest. While MetLife cross-examined Ford about the LTD policy, the jury did not have the benefit of reviewing the policy during its deliberations. Asking the jury to sort out LTD benefits plan terms and conditions, without the contractual document being entered into evidence, is totally contrary to

-30-

*Deskins*. At the retrial, if the trial court allows a punitive damage instruction pursuant to KRS 411.186(2), profitability to MetLife must be limited to the actual value of Grundy's LTD policy only. In other words, the profitability looks to MetLife's actual liability to Grundy based on all terms and conditions of the LTD policy. *Moore v. Commonwealth Life Ins. Co.*, 759 S.W.2d 598, 599 (Ky. App. 1988).

Although not included in the actual instruction on punitive damages, the "not to exceed" language was improperly included in the punitive damages verdict form. Therein, the jury was informed it could award punitive damages up to 115 million dollars against MetLife. As discussed earlier regarding the instruction for emotional distress damages, for the same reasons, we hold this part of the instruction was erroneous and prejudicial to MetLife. This damage claim was premised on Flood's testimony which was speculative and otherwise based on inadmissible evidence of phantom claims by unknown claimants. The distortion and misrepresentation of MetLife's alleged profitability from terminating Grundy's STD claim clearly inflamed the jury to the prejudice of MetLife. Equally prejudicial was the trial court's instruction giving the jury the green light to assess outrageous punitive damages against MetLife, inferring that the court approved an award up to 115 million dollars. On remand, no "not to exceed" language shall be included in a punitive instruction or verdict form.

Finally, we find the award of 5.5 million dollars of punitive damages in this case to be unconstitutional. A punitive damages award violates the due process clause of the Fourteenth Amendment when it is "grossly excessive." *McDonald's Corp.*, 309 S.W.3d at 298. Based our *de novo* review of the trial record below, the award was not justified under the guidelines of the Unites States Supreme Court as set out in *State Farm*, 538 U.S. at 419. Likewise, based on the evidence in this case, the 5.5-million-dollar punitive award was unreasonable and outrageous on its face. *See Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 414 (Ky. 1998). Given our rulings regarding a mistrial and emotional distress damages, the punitive damages in this case were excessive and awarded under passion or prejudice due in large part to erroneous jury instructions and lack of proper admonitions.[12]

## IV. ERISA PREEMPTION

MetLife argued below and on appeal that ERISA preempts all of Grundy's claims in this case and that the circuit court otherwise lacked subject matter jurisdiction to entertain Grundy's complaint. However, this Court has

---

[12] We acknowledge MetLife's concern and argument that the trial court failed to set out the statutory standard for proof for punitive damages in Kentucky Revised Statutes 411.184(2). That standard is clear and convincing evidence of oppression, malice and fraud. However, this is a bad faith case and the applicable precedents cited appear to permit a punitive instruction if compensatory damages are awarded. Nonetheless, we too have a grave concern for this issue in default judgment cases where no standard of proof requirement is given to the jury in the punitive instruction.

previously held that "ERISA preemption is an affirmative defense because it has the effect of eliminating state law causes of action." *Curry v. Cincinnati Equitable Ins. Co.*, 834 S.W.2d 701, 704 (Ky. App. 1992). Under CR 8.03, as a general rule, the failure to timely assert an affirmative defense constitutes a waiver of that defense. *Bowling v. Ky. Dept. of Corr.*, 301 S.W.3d 478, 485 (Ky. 2009). As a result of MetLife's default below, the ERISA defense was waived.

The circuit court also concluded in its April 11, 2023, order denying MetLife's post-trial motions, that MetLife had further waived its ERISA argument by not cross-appealing the October 4, 2017, order in the Grundy II appeal to this Court. MetLife had an early opportunity to present the ERISA issue to this Court for consideration at that time. This would have also allowed either party to raise the issue before the Supreme Court for discretionary review. There being no Kentucky Supreme Court authority to the contrary, we must agree with the circuit court on this issue. The ERISA defense was waived.

## CONCLUSION

For the reasons stated, we reverse the Jefferson Circuit Court's amended judgment and opinion and order denying MetLife's post-trial motions and remand for a new trial in accordance with the directions set forth in this Opinion.

MCNEILL, JUDGE, CONCURS.

-33-

CALDWELL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

CALDWELL, JUDGE, DISSENTING:  I respectfully dissent and would affirm the judgment based on the jury verdict.  Even so, and despite my disagreement with the result reached by the majority, I am compelled to begin this dissent by noting the areas where I agree with the majority's holding.

ERISA PREEMPTION

The majority Opinion succinctly states, "As a result of MetLife's default below, the ERISA defense was waived."  (Pg. 33 of Majority Opinion).  I agree.

Grundy's complaint acknowledged MetLife had asserted that the short-term benefits plan was subject to the Employee Retirement Income Security Act, 29 U.S.C.[13] §1001 *et seq*. ("ERISA").  However, as the majority points out, paragraphs 37 and 38 of the complaint asserted that ERISA did not truly apply to the plan, and MetLife knew it did not.  The majority finds no error in the trial court treating this as admitted fact as well as the assertions in Grundy's complaint – that his claims were not subject to ERISA preemption because the plan at issue was part of a payroll practice.  I agree.

---

[13] United States Code.

Under Kentucky precedent, "ERISA preemption is an affirmative defense . . . ." *Curry v. Cincinnati Equitable Ins. Co.*, 834 S.W.2d 701, 704 (Ky. App. 1992). Generally, "[i]f an affirmative defense is not raised in a responsive pleading or a motion to dismiss, it is waived." *Headen v. Commonwealth*, 87 S.W.3d 250, 254 n.16 (Ky. App. 2002). However, MetLife did not raise ERISA preemption in a responsive pleading because it did not submit one.

I would acknowledge, as did the trial court, that MetLife has presented evidence which *may* support a conclusion that ERISA applies to the benefits plan at issue. For example, the affidavit of Sung Oh, the Life and Health Benefits Manager for the Red Cross, states as much. Had MetLife responded timely to Grundy's complaint, perhaps the state law claims would have been dismissed. But MetLife's default radically changed the preemption calculus. The majority finds no error in the trial court giving effect to MetLife's default here and neither do I.

A party in default "admits only such allegations on the pleadings as are necessary to obtain the particular relief sought by the complaint. As a general rule, in an action for unliquidated damages, a defaulting party admits liability but not the amount of damages." *Howard v. Fountain*, 749 S.W.2d 690, 692–93 (Ky. App. 1988) (footnote and citations omitted). *See also, e.g.*, *Key v. Mariner Finance, LLC*, 617 S.W.3d 819, 825 (Ky. App. 2020). CR 8.04 enforces that

principle by providing that, other than narrow exceptions, "[a]verments in a pleading to which a responsive pleading is required are admitted when not denied in the responsive pleading . . . ." Grundy's complaint is a pleading to which MetLife was required to respond. CR 7.01; CR 12.01. ERISA preemption is an affirmative defense, *Curry*, 834 S.W.2d at 704, and affirmative defenses are waived if not raised in a responsive pleading. *Headen*, 87 S.W.3d at 254 n.16.

Synthesizing those principles, MetLife's failure to respond to Grundy's complaint means it has conclusively admitted the averments in Grundy's complaint necessary to obtain the relief he sought. Grundy specifically pled that the plan at issue was not covered by ERISA, and that MetLife knew so. Thus, MetLife has waived the affirmative defense of ERISA preemption and, instead, has admitted the complaint's allegations that ERISA is inapplicable here.

An unjustified failure to respond to a complaint may cause severe consequences for the defaulting party, and among those consequences is the forfeiture of the ability to raise affirmative defenses. MetLife cited no binding authority showing that it should escape the severe consequences stemming directly from its default. The majority has apparently rejected, as I would, MetLife's argument that the trial court has interfered with, or ignored, prevailing federal law. Simply put, there is no interference with federal law, or any potential supremacy clause implications, because this is not a case involving federal law (i.e., ERISA).

MetLife's default rendered as admitted fact the complaint's allegation that ERISA does not apply here and that the case, as pleaded, presents only questions arising under Kentucky state laws.

The majority recognizes here a severe consequence of the unjustified default – MetLife's forfeiture of its ability to raise affirmative defenses. Furthermore, it recognizes the validity of the trial court's utilization of factual statements from Grundy's complaint, admitted by MetLife as a result of its default, as support for its conclusions of law regarding the applicability of ERISA preemption as a potential affirmative defense. That these are established facts because of the default judgment, as harsh as the consequences may be, does not make them any less the facts. *Honeycutt v. Norfolk Southern Ry. Co.*, 336 S.W.3d 133, 136 (Ky. App. 2011). However, when *the jury's* appropriate consideration of admitted factual matters as a likely basis for its verdict is recognized, as severe as the consequences flowing from these admitted factual matters may be, I believe a different result from the majority's Opinion is required.

PRODUCTION OF THE CONTRACT

Similarly, I take no issue with the majority's rejection of MetLife's argument that Grundy was required to submit the STD contract before the jury could award any compensatory or punitive damages, pursuant to *Deskins v. Estep*, 314 S.W.3d 300 (Ky. App. 2010). The majority declines to address MetLife's

-37-

argument that, because the STD contract was not entered into evidence and ordered published to the jury, the judgment should be set aside. In FN5 of its Opinion the majority held, "The STD benefits award in the amount of $13,061.81, plus accrued interest, remained intact and was subsequently paid by MetLife. In 2021, MetLife deposited funds into court sufficient to cover the judgment plus accrued interest. The judgment for STD benefits is not an issue on appeal. Accordingly, this Court has declined to address MetLife's argument on appeal regarding the failure of Grundy to introduce the STD benefits plan into evidence at trial."

Certainly, following remand to the trial court after this Court's rendering of *Grundy II*, this matter took a procedural course which was distinct from *Deskins*. *Grundy II* presented this Court with the trial court's partial reversal of its original default judgment, granted following an evidentiary hearing unattended by MetLife.[14] Upon our original analysis, the only basis for the original compensatory and punitive damages awards had been amounts which appeared in Grundy's requests for admission that had been deemed admitted as a result of MetLife's failure to respond.[15] The matter now presents this Court with damages awards rendered following an evidentiary hearing by way of a jury trial,

---

[14] *Grundy v. Metro. Life Ins. Co.*, No. 2017-CA-001700-MR, 2019 WL 5490984, at *1 (Ky. App. Oct. 25, 2019).

[15] *Id.*

which occurred with MetLife's full participation and preceded by extensive pretrial motion practice.

I agree with the majority that the intact portion of the original default judgment forecloses MetLife from asserting any argument as to its responsibility to pay the remaining amount of the STD contract. This holding of the majority again appears to implicitly recognize the trial court's appropriate utilization of factual matters deemed admitted as the result of MetLife's unjustified default in reaching its legal conclusions.

So, while I agree with the majority's holdings about waiver of arguments about STD contract responsibility as well as ERISA preemption, I cannot agree with the result reached by the majority for the reasons detailed *infra*. Instead, I would affirm the judgment on the jury verdict which I view as a resolution of this long-pending case that is well-supported from the evidence presented to the jury, including detailed and extensive admitted factual matters.

<u>JURY AWARD</u>

The majority's disdain for the jury's verdict is palpable. This disdain seems largely rooted in disbelief that a jury could award the amount of damages herein where an insurance company wrongfully denied benefits totaling "only" $13,061.81. The majority concludes the compensatory and punitive damages awards here could have occurred only as a result of some prejudicial error in the

-39-

trial. For example, in discussing MetLife's allegations of Grundy's counsel violating the *in limine* order, the majority Opinion finds that "[s]ubstantial prejudice occurred to MetLife as a result of the violation of the *in limine* order, which clearly is reflected in the award of damages, which are grossly excessive . . . ."

But I cannot agree. There is a discernible basis for the jury verdict based upon the evidence and admissions of record heard by the jury. It is not so elusive as to be explainable only by some error which MetLife has failed to identify. The record here provides an adequate basis upon which "a reasonable jury could conclude that [MetLife]'s assertion and prolonged continuation of an ultimately meritless coverage dispute reflected bad faith and caused its insured to endure significant emotional and financial strain." *Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 539 (Ky. 2022) (quoting *Indiana Insurance Co. v. Demetre*, 527 S.W.3d 12, 30 (Ky. 2017)).

In addition to the testimony in the case, the jury learned of a litany of matters to accept as admitted facts in the case, though they had been rendered so because of MetLife's default. The Background section of the majority Opinion prominently references several of these matters. However, they are described there only as "allegations" or "assertions" contained within Grundy's complaint.

At various points, the majority Opinion readily acknowledges some of the implications of MetLife's default, particularly as it relates to legal conclusions reached by the trial court before the matter reached the jury. And the majority has every reason to expect members of the bar to discern the effect of MetLife's default. However, the true gravity of the undisputed factual background heard by the jury because of MetLife's default is difficult to appreciate from a cursory reading of the majority's Opinion. At the conclusion of Grundy's proof, the trial court read much of Grundy's initiating complaint to the jury, explaining it was a "statement of admitted facts in this case for you to consider along with the other evidence you have heard and the other evidence you will hear in this case[.]" This "statement of admitted facts" the jury was instructed to consider included the following:

> MetLife represented to Mr. Grundy that his STD wage payment was subject to the Employment Retirement Income Security Act of 1974, ERISA, stating that Mr. Grundy has the right to bring civil action under section 502A of the Employment Retirement Income Security Act of 1974. Because the STD wage payments – wage payment is a payroll practice, it is not subject to ERISA. MetLife is well aware that a payroll practice is not subject to ERISA. MetLife's representations to Mr. Grundy were intentional.
>
> MetLife is fully aware that by representing ERISA is applicable to his claims, Mr. Grundy would have a difficult time finding qualified counsel to assist him in any subsequent litigation. By asserting that Mr. Grundy's claiming were subject to ERISA, **MetLife knowingly**

**misrepresented that Mr. Grundy's legal remedies were limited, implying that he could not seek compensatory damage and punitive damages and that he would not be entitled to have his claims heard before a jury in a complete trial.**

Finally, the termination letter incorrectly stated that the policy was governed by ERISA. Based upon its contract with American Red Cross, MetLife had a financial incentive to keep American Red Cross by minimizing American Red Cross's financial liability for STD wage payments. MetLife also had a separate financial interest – Its own financial liability under another insurance policy. MetLife insures Mr. Grundy under a long-term disability, LTD, insurance policy designed to dovetail with his STD wage payments should he remain disabled and unable to perform the duties of his own job. If it agreed that Mr. Grundy was unable to perform all the duties of his own job, MetLife risked significant financial liability under the LTD policy.

In order to minimize its own liability, and with indifference to Mr. Grundy, MetLife devised a plan to terminate Mr. Grundy's STD wage payments. As part of this plan, MetLife determined that it would terminate Mr. Grundy's STD wage payments at the earliest juncture with the hope that he would not even file a claim under the LTD policy. As part of this plan, MetLife misled Mr. Grundy concerning his legal rights representing that his STD wage payments were subject to ERISA.

MetLife knew that in the event Mr. Grundy ever filed a lawsuit under ERISA, MetLife would be able to shield its financially motivated self-interest from any meaningful investigation, including by way of example discovery would likely be extremely limited, a jury trial or even a bench trial would be unavailable, any decision would be made by the court. MetLife would assert that it has complete discretion and that as such, the court must uphold its decision, if reasonable, without regard to right

-42-

or wrong and damages would be significantly limited with no compensatory, exemplary or punitive damages available.

. . .

MetLife intended and induced American Red Cross to breach the contract by failing to provide an accurate review of Mr. Grundy'[s] STD wage payments, including but not limited to utilizing an unlicensed physician. As a result – as a direct result of American Red Cross's breach of the STD wage payments, a breach caused by MetLife, Mr. Grundy was and has been deprived of his STD wage payments.

MetLife's motivation was driven solely by its own financial interest without any concern for the resulting impact on Mr. Grundy financially, emotionally and medically. As a direct result of MetLife's actions, Mr. Grundy has been and continues to be damaged.

Moreover, this "statement of admitted facts" was not the first occasion the jury learned of these matters that MetLife's default had rendered undisputed and undisputable. While the majority focuses exclusively on references to the length of the litigation, for much of Grundy's attorney's opening statement, he read or restated much of the initiating complaint. These admitted facts were not characterized as "assertions and allegations" the jury could choose to believe or to reject. Furthermore, MetLife's opening statement conceded these were admitted facts. MetLife has alleged no error on appeal as to the trial court's treatment of the admitted facts pursuant to the default. The majority has not identified such

-43-

treatment as any basis for its reversal, nor has it instructed the trial court to approach the admitted factual matters any differently upon retrial.

The admission here, that MetLife wrongfully caused the termination of Grundy's benefits, then intentionally deceived him to derail him from proper assertion of his legal rights in pursuit of the benefits, solely for its own financial gain, is difficult to overstate. Certainly, these admitted facts evidence "a sustained effort on the part of [MetLife] to deny coverage long after it could and should have determined that it was legally obligated under its contract." *Messer v. Universal Underwriters Ins. Co.*, 598 S.W.3d 578, 584 (Ky. App. 2019) (quoting *Demetre*, 527 S.W.3d at 30).

In my estimation, the effect upon the jury of the undisputed behavior ascribed to MetLife in these admitted facts was likely to be immense. Furthermore, I must conclude this was likely to have had an exponentially greater influence upon the jury's verdict than any violation of the *in limine* order, or the appearance of *Fratzke* sums within the jury instructions. Yet the majority Opinion spends little to no time considering the effect upon the jury of the admitted factual matters above.

The admitted facts of the case are not the only matter quickly dispensed with by the majority. Close examination of the Appellant brief in conjunction with the majority Opinion reveals the majority has mostly rejected

entirely or declined to address the substantive arguments that MetLife, represented by sophisticated counsel, deemed worthy of appeal.

MetLife offers three arguments that it asserts establish that Grundy's claims for *any* damages beyond the $13k should have been barred.  First, it argues that *Deskins* required Grundy to present the STD contract to the jury.  Second, MetLife argues that ERISA preemption barred all of Grundy's state law claims.  Third, MetLife argues the emotional distress award lacked proper supporting evidence and/or was based on improper evidence.  Additionally, MetLife offers three arguments that the punitive damages should fail, maintaining that (1) Grundy did not offer sufficient evidence to support an award of punitive damages; (2) that the trial court gave an erroneous instruction; and (3) that the award is unconstitutionally excessive.

Despite these arguments, the specific relief requested by MetLife in its Appellant's brief is at times unclear.  A prominent example occurs within MetLife's argument that the emotional distress award lacked proper supporting evidence and/or was based on improper evidence.  There, MetLife asserted that the damages were inflated because the jury heard multiple references to the nine years the case had been pending.

However, MetLife offered no specific argument that any such references entitled it to a mistrial or that the trial court's refusal to admonish the

jury during opening statement entitled it to a new trial. MetLife never argued that the admonitions given by the trial court were improper or insufficient. At best, an inference might be made that MetLife has attempted to argue that it is entitled to a new trial due to the cumulative impact of the references to the length of the litigation. It is here that the majority finds its first stated grounds for reversal. However, I remain unconvinced.

<u>MISTRIAL/DIRECTED VERDICT/JUDGMENT
NOTWITHSTANDING THE VERDICT (JNOV)</u>

The majority explicitly concludes that the trial court at several junctures abused its discretion by failing to grant a mistrial for Grundy's references to "nine years" of litigation. The majority concludes that the trial court erred at several junctures as these references occurred. As detailed below, at each juncture for which MetLife itself presented this Court with a remotely related argument, examination of the record reveals MetLife either failed to object entirely or otherwise did not properly preserve its allegation of abuse of discretion. Furthermore, MetLife never requested a mistrial until the day after the references at issue were made. While MetLife's Appellant brief makes slim references to the trial court's denial of a motion for mistrial, it in no way asserts this among any stated grounds for relief requested from this Court.

I disagree with the majority's disregard of MetLife's procedural shortcomings. Even more so, I object to this Court providing research,

-46-

articulation, and construction of arguments on MetLife's behalf. Where the trial court heard no proper request to exercise its discretion, I would hesitate to conclude that discretion was abused. Furthermore, as noted by the majority, the case is lengthy in time as it is now on its third appeal, and enormous in record with over 7,500 pages of record. In the face of such a record and where the trial court issued a number of relevant pretrial orders which are not challenged on appeal, I would be hesitant to venture into areas that were not pursued on appeal and for which we have received no guidance from the parties, unless absolutely necessary.

The majority decision today lends scant credit to the judgment of the trial judge who sat through the three-day trial as well as hearing and ruling upon extensive pretrial litigation. The decision inexplicably overlooks evidence on key issues, including admitted facts that the jury was not free to ignore. I must note in my objection to the majority's analysis today the paucity of due consideration of the discretion placed with a jury tasked with the determination of damages. As our Supreme Court held in *Asbury University v. Powell*, 486 S.W.3d 246, 264 (Ky. 2016):

> Civil Rule 59.01 provides that a trial court may grant a new trial for, among other things, "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice or in disregard of the evidence or the instructions of the court." CR 59.01(d). Whether to grant or deny a new trial for an allegedly excessive verdict lies within the discretion of the trial court. *Childers Oil Co., Inc. v. Adkins*, 256

S.W.3d 19, 28 (Ky. 2008).  **However, "[t]he amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because [the court] would have reached a different conclusion**." *Id*. *quoting Hazelwood v. Beauchamp*, 766 S.W.2d 439, 440 (Ky. App. 1989). Instead, "their decision should be disturbed only in the most egregious circumstances." *Id*.  Courts must refrain from disturbing the jury's assessment of damages "[i]f the verdict bears any relationship to the evidence of loss suffered."  And **"[o]nce the issue [of excessive damages] is squarely presented to the trial judge, who heard and considered the evidence," a reviewing court on appeal cannot "substitute [its] judgment on excessiveness for [the trial judge's] unless clearly erroneous**." *Davis v. Graviss*, 672 S.W.2d 928, 933 (Ky. 1984).

486 S.W.3d at 264 (emphasis added).

That we will disturb a jury's determination of the amount of damages, following proper consideration by the trial judge as described in *Asbury*, only in exceedingly narrow circumstances is long settled.  *Id*.  A trial court's decision as to whether to grant a new trial "involves something more than the narrow issue of whether there is substantial evidence to support the verdict." *City of Louisville v. Allen*, 385 S.W.2d 179, 184 (Ky. 1964), *overruled on other grounds by Nolan v. Spears*, 432 S.W.2d 425 (Ky. 1968).  A trial court's order on its decision "is presumptively correct[;] if there is doubt about the correctness of [the trial judge's] ruling, it must be upheld." *Id*.  "Even if in our opinion the record would more

strongly support a different conclusion, if there is substantial reason for his decision, then [the trial judge] has not clearly erred." *Id*.

However, the majority Opinion largely avoids meaningful consideration of these principles by declining to address what it describes as "the court's failure to grant a directed verdict or JNOV."[16] Instead, the majority's initial stated grounds for remanding for a new trial concerns the trial court's failure to grant a mistrial because of Grundy's alleged violations of the trial court's *in limine* order. However, I see no indication the trial court acted in a manner that was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles" when it denied MetLife's motion for a mistrial. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

With good reason, the majority declines to explicitly adopt any of the legal conclusions proffered by MetLife on appeal. However, the majority does appear to have adopted MetLife's assertion that any reference to "nine years" made by Grundy was an egregious violation of the trial court's order *in limine*. Additionally, the majority appears to have adopted certain interpretations of fact from MetLife's position. A troubling instance of this is apparent agreement with MetLife that the only possible motivation for Grundy to have mentioned the period

---

[16] In its Appellant brief, MetLife asserts that it was entitled to a directed verdict and/or JNOV with stated grounds of Grundy's failure to introduce the STD contract in conformity with *Deskins* and on grounds of ERISA preemption.

of the pendency of litigation at all would be to elicit non-recoverable "litigation stress" damages.

The majority points out that the *in limine* order at issue prohibited either party from presenting evidence "relating to litigation conduct and/or any evidence suggesting that MetLife is the cause or is to blame for the length of litigation after MetLife entered their appearance in this case[.]"  R. at 5574-75. Notably, the order did not explicitly prohibit any reference to the period of "nine years."  In fact, the applicable period covered by the order – "the length of litigation after MetLife entered their appearance" on October 7, 2015, to when the trial began on October 24, 2022, was about *seven* years.

It is further noteworthy that the order did not prohibit *any* mention or reference to the length of the case.  And properly so.  Certainly, this Court has recognized the principle that "evidence of an insurer's general litigation tactics (distinguished from evidence of its settlement behavior during the course of litigation) is generally not admissible on the issue of bad faith."  *Hamilton Mut. Ins. Co. of Cincinnati v. Buttery*, 220 S.W.3d 287, 295 (Ky. App. 2007). Nonetheless, this principle also recognizes that the insurer's duty to settle claims under the UCSPA continues into litigation.

As our Supreme Court recognized in *Knotts v. Zurich Insurance Co.*, some conduct that occurred subsequent to the commencement of litigation of a tort

action under the UCSPA remains admissible. 197 S.W.3d 512, 517 (Ky. 2006). In

*Knotts*, the Court stated:

> The commencement of litigation by the filing of a complaint, even when the claim adjustment process is underway, however, does not change the fundamental nature of what the claimant seeks. – The claimant has simply opted to seek satisfaction of the claim through a different procedure. Nothing in KRS 304.12–230 limits its applicability to pre-litigation conduct, and since the statute applies to "claims," it continues to apply to an insurer so long as a claim is in play. As such, we hold that KRS 304.12–230 applies both before and during litigation.
>
> Though the statute's language is clear, we also note that this reading is consistent with the public policy underlying the statute. *See State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988) ("The Kentucky law is similar to those adopted by thirty-eight other states and is based on the 1971 amendment that the National Association of Insurance Commissioners made to its model 'act relating to unfair methods of competition and unfair and deceptive acts and practices in the business of insurance.' This statute is intended to protect the public from unfair trade practices and fraud. It should be liberally construed so as to effectuate its purpose."). If KRS 304.12–230 were not applicable once litigation commenced, insurance companies would have the perverse incentive to spur injured parties toward litigation, whereupon the insurance company would be shielded from any claim of bad faith. Such a reading would undermine the statute's fundamental purpose by allowing insurance companies to engage in whatever sort of practice – fair or unfair – they see fit to employ. The remedial nature of the statute requires that we attempt to effectuate its purpose, which, in a situation like this one,

requires applying the statute to conduct occurring after the commencement of litigation of a tort action.

197 S.W.3d at 517.

In a recent unpublished case, this Court has recently recognized that the use of the word "claim" in *Knotts* included an insured's assertion of a right to compensatory payment under the policy.[17] The majority asserts Grundy's STD benefits were not paid into court until 2021, the year previous to the trial. However, MetLife had wrongfully terminated the STD benefits in early 2013 – a period of nine years.

For these reasons and others stated *infra*, I cannot agree with the majority's conclusion that references during the trial to the length of the case alone were overly prejudicial.

Furthermore, I disagree with the majority's implicit assessment that every reference made to the overall length of the litigation was in violation of the trial court's *in limine* order. On the sparse occasions where a clear violation of the order occurred *and* a proper objection was contemporaneously lodged,

---

[17] "As the *Knotts* Court has explained, the word 'claim' has multiple definitions, '[b]ut at its most basic, the word means an assertion of a right, with the contours and specific nature of the right depending on context[,]' and in the context of insurance, this means an assertion of a right to compensatory payment under the policy." *Old Republic Aerospace Inc. v. Louisville Aviation, LLC*, No. 2023-CA-0111-MR, 2024 WL 4996722, at *9 (Ky. App. Dec. 6, 2024), *review denied* (Oct. 15, 2025) (quoting *Knotts*, 197 S.W.3d at 516).

consideration of precedent leads me to conclude the trial judge adequately admonished the jury.

As stated by the majority, and in many published cases in this Commonwealth, opening statements are not evidence. Yet the primary example cited by the majority of the trial court declining MetLife's request for a jury admonition occurred during opening statements. Moreover, on these occasions that MetLife objected and requested admonitions, any violation of the *in limine* order cannot be accurately described as flagrant or even explicit. Elsewhere, the majority emphasizes and quantifies the number of occasions Grundy's counsel referred to the period of "nine years," implying that each was a flagrant violation of the *in limine* order. Close examination of the record simply does not support this inference.

Early on during opening statements, Grundy's attorney said: "We are nine years into this case. Nine years. Nine years into the case." MetLife objected. During the bench conference, the trial court clarified that, pursuant to the *in limine* order, mention of the length of litigation remained permissible when offered to show how it impacted Grundy but not to assign blame. The court stated that Grundy's counsel's references assigned blame to MetLife. Facially, these comments did not overtly place blame on MetLife for the length of time, though perhaps the trial judge concluded counsel's tone of voice carried such an

-53-

implication.  That the case had been pending for about nine years was a simple matter of fact.  Despite the trial judge admonishing counsel, he did not admonish the jury.  As the comment was not an explicit violation of the trial court's order, there was no abuse of discretion in declining a jury admonishment.

Almost immediately thereafter, Grundy's counsel stated Grundy had "endured" the lawsuit for nine years, then repeated the phrase "nine years."  The trial court overruled MetLife's objection.  Here again, I see no error on the part of the trial court; those statements placed no direct blame on MetLife for the length of the litigation.

Later, Grundy's counsel said the jury would hear requests for damages for MetLife's "nine years of misconduct."  This statement occurred during the same remarks the majority emphasizes as an egregious violation of the trial court's *in limine* order.[18]  This statement *did* bluntly infer that MetLife was to blame for the length of the litigation.  Remarkably, however, MetLife made no objection.

About fifteen minutes later, Grundy's counsel again mentioned that Grundy was forced to file the lawsuit nine years ago.  Again, MetLife did not object.  Although the comment blamed MetLife for Grundy having had no choice but to file suit, there was no blame cast for the length of time the suit had been

---

[18] ("You're going to hear $9 million per a year as a punishment on the low end.  It could be higher.  As a punishment and deterrent for their nine years of misconduct.")

pending. After all, by virtue of the trial occurring, the jury was cognizant that Grundy and MetLife had a dispute they had been unable to resolve amicably.

A few minutes later, Grundy's counsel said the jury would hear about emotional distress Grundy had experienced over the last nine years. MetLife did not object. That statement did not facially state, or imply, that MetLife was responsible for the length of the litigation. Moreover, there is nothing inherently improper in a plaintiff raising a bad faith claim and seeking damages for emotional distress to refer to ongoing stress which continued into the pendency of the litigation. *Demetre*, 527 S.W.3d at 40.

A couple minutes later, Grundy's counsel discussed how Grundy had attempted to distance himself from stressors, but Grundy could not distance himself from the lawsuit. Counsel remarked "[n]ine years this has been going on. Nine years." MetLife objected, arguing at a bench conference that Grundy's counsel had again linked MetLife's conduct to the length the lawsuit had been pending. MetLife requested an admonishment to the jury that neither side was to blame for the length of the litigation. The trial court obviously agreed the remarks were improper because, seemingly frustrated, the judge remarked: "[t]he way that you are phrasing it is assigning blame . . . . You're very argumentative . . . you keep on saying 'nine years' in the context of blaming MetLife. Stop. No more nine years because you can't, can't stop yourself from doing that. The nine years is

out . . . . I don't want to hear it again." Despite again admonishing counsel, the court simply responded "no" when MetLife requested a jury admonition.

However, following Grundy's opening statement, the trial court did again admonish the jury that opening statements were not evidence and should not be considered as such. Juries are presumed to follow such admonitions; the award of substantial damages here is insufficient to conclude this admonition was ignored. And given MetLife's failure to object to the most egregious violation of the *in limine* order, and its only contemporaneous objections to counsel's reference to "nine years" occurred during statements which cast no direct blame, it does not follow that the any violations of the *in limine* order were "of such character and magnitude that [MetLife was] be denied a fair and impartial trial" or that "the prejudicial effect [could] be removed in no other way" but a mistrial. *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996).

Turning to testimony perceived by MetLife to have violated the order, I can only conclude much the same. Grundy's counsel asked Grundy how his physical health had been since he stopped working for the Red Cross in 2012. In his answer, Grundy stated his physical health was "not that good" because "for the last nine years I've been worried about what's going to happen with me with MetLife." MetLife made no objection. Understandably so, the testimony did not facially blame MetLife for the delay in reaching a trial.

Shortly afterwards, Grundy's counsel asked Grundy if his level of stress had changed "over the last nine years," to which Grundy responded "no, because I still got MetLife to deal with." MetLife again did not object. And again, the testimony cast no blame on MetLife as to the delay in proceeding to trial.

A couple minutes later in Grundy's direct testimony, counsel asked him if he recalled when the lawsuit against MetLife was filed. MetLife objected. The trial court did implicitly deny the objection by noting that counsel was simply trying to lay the foundation for introduction of the complaint. And, that question sought information not prohibited by the pretrial order.

A few minutes later, his counsel asked Grundy why he wanted to punish MetLife by requiring it to pay punitive damages. Grundy responded: "for what MetLife has done to me for the last nine years." MetLife objected. I agree that this testimony violated the pretrial order; it related MetLife's misconduct to the length of the case's pendency. However, the trial court admonished the jury to disregard Grundy's answer. With rare exceptions these facts do not present, we are to presume that a jury will follow an admonition. *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017). And MetLife sought no further relief at that juncture. Accordingly, this Appellant "received all the relief [it] requested . . . thus, there is no error to review." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

Furthermore, even if MetLife *had* made a timely motion for mistrial,

the trial court would have been well with in its discretion to deny it. Grundy's testimony here is consistent with that in *Demetre*, where the claimant testified:

> What I've been through in these past four years because of that insurance company over there. They didn't honor their contract. I think it's wrong. I made a deal with them and they took my money and they fought me. And they just fought me for four years. To this day I'm still fighting.

527 S.W.3d 12, 23.

Later that afternoon, Grundy's counsel asked the psychologist what Grundy had told her about how his stress had changed over the years. The psychologist began to say something about "this nine years" when MetLife objected. Given the incompleteness of the psychologist's answer, it is impossible to discern with reliable certainty whether, uninterrupted and taken in context, the statement would have violated the pretrial order. Nonetheless, after a bench conference, the trial court admonished the jury to ignore the psychologist's statement. MetLife again sought no additional relief. Again, I must conclude appellate relief would be improper. *Johnson*, 105 S.W.3d at 441.

It was not until the following morning that MetLife first made a motion for a mistrial. That motion was based in part on the references the prior day to the nine years the case had been pending during opening statements and testimony. The court denied the motion, stating that it had given admonitions, which it expected the jury to follow. While the record shows that the trial court

declined MetLife's requests for a jury admonition during Grundy's counsel opening statement, it also reflects MetLife's failure to contemporaneously object to any statement of Grundy's counsel in explicit violation of the pretrial order.

We review the trial court's denial of a motion for mistrial under the deferential abuse of discretion standard. *Oghia v. Hollan*, 363 S.W.3d 30, 32 (Ky. App. 2012). Here, the court specifically admonished the jury at least twice during testimony and reiterated the general admonition that opening statements are not evidence. Despite any arguments to the contrary, MetLife has not demonstrated the jury could not follow those admonitions. There was no abuse of discretion in denying the motion.

Without citing to authority directly on point, MetLife's brief asserts that "[a]warding emotional distress damages based on the length of litigation inequitably forces a defendant to pay not only for exercising its constitutional right to defend itself but also for timing circumstances beyond the defendant's control." As *Knotts* demonstrates, where a "claim" for compensatory payment remains outstanding, as it did here until the year prior to trial per the admitted facts, such a sweeping statement as MetLife's is inaccurate. 197 S.W.3d at 517.

Given this backdrop, MetLife has not adequately shown that the verdict here was based on the length of litigation instead of the testimony presented at trial, especially considering the admonitions given by the trial court. And,

certainly, the trial court did not find it so. On pg. 8 of its Opinion and Order

Denying Post Trial Motions, the trial court stated:

> MetLife argues a new trial is warranted as the admonitions given by the Court were not enough to overcome the prejudice caused to MetLife. MetLife points to the amount of the damages award as proof of the prejudice it has suffered. The Court disagrees. The Court gave admonitions when requested, and as needed in the Court's discretion. As noted above, the damages awarded by the jury were supported by sufficient evidence, so the Court cannot say that the amount of those damages serves as proof of any prejudice or ill will towards MetLife. For that reason, the Court cannot agree with MetLife's assertion that its repeated admonitions to the jury were insufficient to "cure" any prejudice caused by the testimony and statements at trial concerning the length of this litigation or MetLife's failure to take corrective action. *Jefferson v. Eggemeyer*, 516 S.W.3d 325, 338 (Ky. 2017).

And on pg. 6 of the same order, the trial court briefly discussed the evidence to

which it was referring:

> Here, the Plaintiff testified as to the anxiety caused by MetLife's termination of his short-term disability benefits. The Plaintiff has been an employee of the Red Cross for 22 years and, at a time when he needed the benefits provided by his employer the most, they were terminated by MetLife while he was still unable to work. The Plaintiff testified that this situation created stress, causing him to reevaluate his financial situation, particularly his budget so that he could maintain his home. Based on the verdict, the jury appears to have appreciated the circumstances he found himself in because of the wrongful termination of his benefits.

Having examined the references at trial in detail, none alone entitles MetLife to relief. Upon close examination of the trial record as a whole and the references cumulatively, neither do the comments collectively entitle MetLife to relief. *Many* of the references MetLife decried were simply not clear violations of the pretrial order. And MetLife failed to object altogether to the one clear violation of the pretrial order during opening statements and the trial court admonished the jury in response to another.

No trial is perfect. MetLife's frustration that any violation of the pretrial order occurred at all is understandable. However, after careful consideration of the record and applicable law, I simply cannot conclude MetLife has demonstrated that the references to the length of the litigation entitles it to relief.

> [I]n most cases, a discretionary decision will be a close one, at least from the appellate perspective, and will not be disturbed by an appellate court unless it 'is firmly convinced that a mistake has been made.' *Walters* [*v. Moore*, 121 S.W.3d 210, 215 (Ky. App. 2003)] *quoting Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995). An appellate court can only reverse the trial court's decision if it is sure that the decision is incorrect – any doubts must be resolved in favor of the trial court:
>
> > If there is doubt about the correctness of his ruling, it must be upheld. If the record supports his ruling, it will not be reversed. Even if in our opinion the record would more strongly support a different conclusion, if there is substantial reason for

> his decision, then he has not clearly erred.
> *Allen*, 385 S.W.2d at 184.

*CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 72 (Ky. 2010) (discussing the

deferential standards of review governing rulings on motions for a new trial).  *See*

*also* CR 59.01 (setting forth grounds for a new trial).

Were this the point where this dissent could artfully conclude, it most

certainly would.  However, the majority Opinion did not simply express its reason

for reversal and end its Opinion.  The majority Opinion here has gone to some

lengths to rule and put forth significant preclusions for the next trial on matters not

argued before this Court.  Therefore, I cannot in good conscience conclude this

dissent here.

This dissent is compelled to address the overreach which occurs

within the majority's Opinion, largely as a result of providing multiple whole cloth

arguments on behalf of the Appellant.  As has been stated many times by many

appellate panels, "It is not our function as an appellate court to research and

construct a party's legal arguments[.]"  *See, e.g.*, *Hadley v. Citizen Deposit Bank*,

186 S.W.3d 754, 759 (Ky. App. 2005); *see also Harris v. Commonwealth*, 384

S.W.3d 117, 131 (Ky. 2012) (citing *Doherty v. City of Chicago*, 75 F.3d 318, 324

(7th Cir. 1996)) (internal quotation marks omitted) ("[I]t is not the function of the

an appellate court to research and construct the legal arguments open to parties,

especially when they are represented by counsel."). And yet the majority panel has done so explicitly here.

## EMOTIONAL DISTRESS DAMAGES

The majority appears receptive to MetLife's argument that any compensation for Grundy's emotional injury claims is barred because his alleged injuries were not severe or serious as required by *Osborne v Keeney*, 399 S.W.3d 1 (Ky. 2012). The majority Opinion complains that the trial court's jury instructions did not address this requirement. The Opinion acknowledges Grundy's argument that our Supreme Court clearly rejected this argument in *Demetre*, 527 S.W.3d at 40 n.30. However, the majority concludes that we need not directly address the issue in this case because the evidence Grundy presented at trial as to his emotional distress was not clear and satisfactory. Despite declining to directly assess MetLife's argument as to *Osborne*, the analysis which follows often reads as a conflation of "clear and satisfactory proof" with "severe or serious injury."

Reiteration of our Supreme Court's Footnote 30 in *Demetre* is merited:

> **[W]e have never embraced *Anderson*'s requirement that the plaintiff must "prove substantial damages aside and apart from the emotional distress," nor have we barred recovery for emotional distress damages that were <u>not</u> severe**. *See Motorists Mut.*, 996 S.W.2d at 454 (**damages for anxiety and mental anguish are recoverable in an action for statutory bad**

**faith, if clear and satisfactory evidence supports inference that anxiety or mental anguish occurred**). **In <u>not</u> requiring "severe" emotional distress, Kentucky is certainly not alone**. *See, e.g.*, *Farr v. Transamerica Occidental Life Ins. Co. of California*, 145 Ariz. 1, 699 P.2d 376, 382 (App. 1984) (emotional distress damages could be awarded in a bad faith case, "even though the defendant did not intentionally cause the distress and even though the distress was not severe."); *Jacobsen v. Allstate Ins. Co.*, 351 Mont. 464, 215 P.3d 649 (2009) (plaintiff was not required to demonstrate serious or severe emotional distress to recover emotional distress damages arising out of a bad faith claim). **Nor are we alone in <u>not</u> requiring proof of economic or physical loss caused by the insurer's bad faith**. *See, e.g.*, *Goodson* [*v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 412 (Colo. 2004)] ("We hold that, in a tort claim against an insurer for breach of the duty of good faith and fair dealing, the plaintiff may recover damages for emotional distress without proving substantial property or economic loss."); *Miller v. Hartford Life Ins. Co.*, 268 P.3d 418, 432 (Haw. 2011) ("If a first-party insurer commits bad faith, an insured need *not* prove that the insured suffered economic or physical loss caused by the bad faith in order to recover emotional distress damages caused by the bad faith.") (emphasis in original).

*Demetre*, 527 S.W.3d at 40 n.30 (emphasis added).

That Grundy's emotional distress damages should not fail, even if they are not "severe," seems readily apparent. A bad faith claim is distinct from a claim for negligent infliction of emotional distress. So, what is the majority Opinion referring to when it says the evidence presented at trial was not "clear and satisfactory"? And why does it matter that Grundy had, as stated by the majority,

"No attending physician or family members testif[y] regarding Grundy's emotional distress.  And there was no evidence of adverse impact, including medical treatment, on Grundy due to the termination of STD benefits after 2013."?[19]

There was the testimony of Grundy.  There was the testimony of Dr. Voor.

The majority focuses upon testimony it characterizes as "admissions" that Grundy's health had improved over time and that stress he felt because of MetLife's denial of his STD was confined to the period of 2013.  However, examination of the actual testimony demonstrates that Grundy was far from unequivocal as to these concessions.[20]

> Q.  How has your health changed since leaving the American Red Cross in November 2012?
>
> A.  How my health has been?
>
> Q.  Yes.
>
> A.  Well, I have my good days and bad days, but, you know, that's how it goes sometimes.
>
> Q.  Let's ask a better question.  How has your physical health changed?
>
> A.  Physical?  It's not that good.

---

[19] The majority emphasizes an instance of testimony by Grundy that the majority construes as an admission "that he had no medical problems after February of 2013 that could be attributable to MetLife[.]"  This testimony is consistent with that of *Demetre*, who "acknowledged that he was in very good physical health for a seventy-two-year-old man[.]"  *Demetre*, 527 S.W.3d at 23.

[20] In Grundy's initial direct testimony, the record additionally reflects that MetLife made no objection to Grundy's initial reference to the period of "nine years[.]"

Q. You say, "not that good," has it deteriorated? Has it improved?

A. Well, lot – lot – well, all the stress I'm going through and -- and what I had to put up with dealing – you know, I worry – I've been – for the last nine years I've been worried about what's going to happen with me with MetLife.

Q. And that's impacted your mental health, as well?

A. Yes.

Later during Grundy's direct examination, he was again far from unequivocal that his stress had improved or that he was "just fine":[21]

Q. How do you manage your depression?

A. Well, my doctors got me on – got me on a schedule and got me – the medicines I needed to, you know, to get by and with my depression and stuff. And as long as I take them every day, I'm fine, you know, but when I have my bad days, it's just a bad day.

Q. But has your level of stress changed over the last nine years?

A. No, because I still got MetLife to deal with.

The assertion that Grundy conceded in his testimony that his health had improved appears to have been based on his deposition testimony. However, Grundy did not simply and unequivocally concede that he had experienced an improvement in his health during the period following his filing the complaint.

---

[21] This testimony also marks second occasion in Grundy's direct examination testimony that he referenced a period of "nine years," and MetLife again made no objection.

During cross-examination, the following testimony occurred after Grundy had

been extensively questioned about his preexisting health conditions and treatment:

> Q. Mr. Grundy, you – given all of those – all of those struggles that we've talked about, you would agree with me that you've developed no additional medical problems or challenges after February 2013 that were not already present before that time, right?
>
> A. Yes, but I still deal with stress and everything on a daily basis.
>
> Q. And in dealing with all of that, Mr. Grundy, you believe you were able to get past these struggles and move on around 2015; is that right?
>
> A. Once I had some type of closure and I got away from that situation.
>
> Q. In fact, as we sit here today, Mr. Grundy, you . . . feel like you're in a good place in handling the medical challenges and depression challenges that you – you have, don't you?
>
> A. Yes.
>
> Q. And – and you believe that – you feel like you're even in a little better health today than you were back then in 2011, don't you?
>
> A. No. I'm not in a little better health. My – my health is still deteriorating.
>
> Q. Well, that's not the way that you answered that question in our deposition is it, Mr. Grundy?
>
> A. I can't remember all of it.
>
> Q. Well, I – fair enough. I understand. Let me – let me – let me remind you of what you answered to that question in your deposition. Play page 95.
>
> (VIDEO PLAYED TIMESTAMPED 11:16:58)

A. Okay.

Upon redirect examination, the jury heard Grundy's testimony regarding another response from the same deposition:

Q. Would you please turn to page 193 for me?

. . .

A. 193. Okay.

. . .

Q. The question was, is it fair to say that from 2011 to 2012 *forward* your health has declined? And your answer was?

A. Then it was yes.

Q. And is that still your testimony?

A. Uh-huh.

(Emphasis added.)

The source of Grundy's "concession" that any financial stress he experienced resolved before the end of 2013 appears to have been based upon statements he was reported to have made in medical records from the VA. However, the record demonstrates that Grundy testified that any such statements occurred well after 2013. Moreover, the same testimony reiterates his assertion that the source of his distress related to conduct that was distinct from any litigation tactics:

Q. I believe you said that after 2013, 2014 you started seeing the VA?

A. Actually, I started going to the VA after I got out of the hospital with the diabetes problem.

Q. Okay.

A. That was in 20 – 2016.

. . .

Q. Okay. Have you experienced stress, worry, anxiety, based on what MetLife has done to you?

A. Yes.

Q. Have you experienced stress, anxiety and worry for the things that MetLife has been found liable for?

A. Yes.

Grundy's testimony regarding his emotional distress was not excessively lengthy or detailed; certainly, it was not histrionic. Nonetheless, it was consistent with the claimant in *Demetre* who worried that the insurance company's denial of coverage "would deplete his financial resources and likely force him to declare bankruptcy." 527 S.W.3d at 40. Here, Grundy testified:

> Q. How did the loss of those short-term disability benefits impact you financially?
>
> A. I had to reevaluate my budget as far as, you know, spending and being able to keep food in my house, and – and – and I was – you know, sometimes I had to – if I saw doctors, I had to pay for my medicines and you know, I just had to evaluate and restructure my budget.
>
> Q. Was it stressful?

A. Yes, it was stressful.

The majority asserts its decision that there was inadequate evidence for the emotional damages claim is "buttressed" by the trial testimony of Grundy's expert witness, clinical psychologist Dr. Voor. Here again, I disagree. In particular, I disagree with the unqualified assertion that Dr. Voor's testimony: "acknowledged that her review of any psychological stress by Grundy was limited to the period of 2012-2013 and testified that any stress or worry by Grundy was exacerbated by MetLife during this period of time only."

In fact, Dr. Voor testified repeatedly that she reviewed records extending into 2014 which evidenced Grundy's emotional distress resulting from the denial of his STD benefits.[22] She did acknowledge that her *record review* had been limited to the period of 2012-early 2014. However, and more importantly, she also testified that on the occasion she examined Grundy in 2022, he still

---

[22] ("So, the records helped me understand Mr. Grundy's psychological functioning from, say, end of 2012, beginning of 2013 through 2014."

"Well, the records showed that for the period of, I believe it was January 2013 to January 2014, he was reporting ongoing stress and worry about the insurance issues with MetLife. He had depression. He had anxiety and he was having financial concerns."

"Mr. Grundy's stress and worry during that period of time, from the beginning of 2013 to -- you know, through 2000 – through 2000 – until early 2014 was related to his dealings with MetLife, not being paid his benefits, them not responding to his requests and him just feeling anxious and worried and stressed over his finances, his future and his livelihood.").

suffered from stress and anxiety that she attributed to MetLife's denial of his STD benefits.

On direct examination, Dr. Voor's testimony was cut short because of the sustained objection and jury admonishment following her reference to the period of "nine years[.]"

> Q. So, the medical records establish that in 2013, 2014 he was experiencing stress and worry because of the issues that he was having with MetLife, correct?
>
> A. Yes.
>
> Q. And during your interview with Mr. Grundy, did you have occasion to talk to him about that and what's happened since then?
>
> A. Yes.
>
> Q. And based on your interview with him, did he describe how his stress and worry has culminated or changed over the years?
>
> A. Yes. He talked about that this nine years[.]

However, on cross-examination, Dr. Voor made clear that her assessment of Grundy included her opinion that he continued to experience emotional distress during that period because of the denial of his STD benefits and distinct from and litigation conduct by MetLife:

> Q. All right. So, in that sequence, in those questions trying to get at, you can't separate out these lost three

-71-

months of benefits in 2013 from anything else that's going on Mr. Grundy's life, can you?

A. I can't separate out a percentage or put a number on it but what I can say is that the actions of MetLife left Mr. Grundy in a much lower place, a worse place, with more stress and anxiety than he had before.

Q. Well, your own testing showed that he had a minimal level of depression when you saw him in April of 2022.

A. Yes. His depression had improved over time.

Q. And your own testing showed that he had only moderate symptoms of anxiety when you saw him in April of 2022?

A. Yes, he continued to have anxiety, stress and worry, yes.

Q. And isn't it true that there's no way to test Mr. Grundy to determine whether the moderate anxiety that he exhibited when you saw him was due to the denial of three months of disability benefits; isn't that true?

A. Well, based on my interview with Mr. Grundy, and the records, that was part of his anxiety, yes.

Q. Okay. Well, then, you don't have a basis for saying, based upon one visit in April of 2022 that Mr. Grundy was in financial distress of any kind?

A. Well, I do in that it's repeatedly documented in his therapy with Dr. Gatlin that he was under financial stress, and he also reported that to me.

Q. But you don't know what it was about? You don't know what caused it?

A. Well, according to the records, and what Mr. Grundy told me, he was under financial stress because of a situation and the actions of MetLife.

Q. Because of three months of short-term disability benefits instead of six, he was in financial distress in 2022; is that what you're saying?

A. Well, he was stressed and worried about the ongoing, unresolved issues.

Q. That's your professional conclusion?

A. Yes.

Aside from the testimony, there is the fact that MetLife did not enter the agreed judgment under which Grundy's wrongfully denied STD were paid until at least 2021. Considering all of the above, I can only conclude that the trial court's determination that "the damages awarded by the jury were supported by sufficient evidence" was not clearly erroneous. **"Deciding** whose version to believe and weighing witness **credibility** is entirely within the **jury's** discretion." *Hall v. Commonwealth*, 337 S.W.3d 595, 610 n.52 (Ky. 2011) (quoting *Robinson v. Commonwealth*, 325 S.W.3d 368, 371 (Ky. 2010)) (emphasis added). While the majority deems the evidence insufficiently "clear and satisfactory," it was to the jury. So, even if this case reversed and remanded for a new trial because of a perceived prejudice deemed too great to overcome by the multiple references to the action taking nine years to come to trial, how can it be within this court's purview

to limit any damages to Mr. Grundy to only 2013?  It is a significant overreach of this Court to do so.

## COMPENSATORY DAMAGES INSTRUCTION

Additionally, the majority's position, that the trial court's compensatory damages instruction was in error for not explicitly reciting a heightened "clear and satisfactory" standard of proof, does not simply overreach, it conflicts with the binding precedent of our Supreme Court.  Nowhere in *Demetre* is it indicated that this standard of proof should be explicitly stated in the court's instructions.  However, in *Farmland Mutual Insurance Co. v. Johnson*, our Supreme Court did address whether a heightened standard of proof was required in jury instructions for a bad faith claim.  36 S.W.3d 368, 380 (Ky. 2000).

In that case, Farmland argued reversible error occurred where the trial court's punitive damages instruction had not adequately restated the language of KRS 411.184(2), which contained the heightened "clear and convincing" standard of proof.[23]  36 S.W.3d at 381.  The Court rejected the argument that a heightened standard of proof was required in jury instructions for a bad faith claim and determined the instructions adequately stated the three-part test for a bad faith

---

[23] (KRS 411.184(2) states that "[a] plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice.")

claim. 36 S.W.3d at 381 (citing *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 177–78 (Ky. 1989)).

This Court has previously, in an unpublished opinion based on the precedent of *Farmland*, rejected an argument that a bad faith claim required that the jury instructions recite the elevated "clear and convincing" standard of proof.[24] Having previously determined a trial court's instructions, including as to liability, need only state the three-part test for a bad faith claim correctly and required no mention of the statutorily-required standard of proof, I see no reason that *Demetre*'s mention of "clear and satisfactory" proof required the compensatory damages instruction here to include that standard.

Furthermore, the majority has not simply constructed an argument for MetLife that was never presented to the trial court. In fact, review of the record shows that this argument is incompatible with what MetLife requested of the trial court. In Defendant's Proposed Jury Instructions, filed on October 17, 2022, MetLife requested that the trial court provide the jury with an instruction on the standard of proof. However, the request was not for the elevated standard; MetLife proposed that the trial court include an instruction that the jury utilize the "preponderance of the evidence" standard of proof:

---

[24] *Med. Protective Co. v. Wiles*, No. 2010-CA-000262-MR, 2011 WL 13481678, at *5–6 (Ky. App. Jun. 17, 2011), *as modified* (Oct. 21, 2011).

INSTRUCTION NO. 5. The burden of proof in this case is on Mr. Grundy. This means that Mr. Grundy must prove every essential element of his claim by a preponderance of the evidence. If the proof should fail to establish any essential element of Mr. Grundy's claim by a preponderance of the evidence in the case, the jury should find for MetLife. To "establish by a preponderance of the evidence" means to prove that something is more likely so than not so.

The majority's whole cloth construction of an argument that MetLife did not simply fail to make, but actively moved the trial court in contravention of, is difficult to reconcile with our established approach. It induces visions of this Court seeking out *sua sponte* a can of worms unoffered by any party, unfed to the trial court, and that we normally would not eat. *See Grundy v. Commonwealth*, 25 S.W.3d 76, 84 (Ky. 2000) ("[W]e will not allow appellants, under the guise of developing an argument raised in the trial court, to feed one can of worms to the trial judge and another to the appellate court.") (internal quotation marks and footnote omitted).

Additionally, the majority discerns error in the trial court's compensatory damages instruction for failing to instruct the jury that the basis for Grundy's damages must be confined to emotional distress he experienced only in 2013. Here again, MetLife never raises this argument to this Court. The majority confines any damages from emotional distress springing from MetLife's wrongful failure to pay Grundy's STD as "short-term financial stress or anxiety" that could

not have extended past 2013 because Grundy began receiving some retirement benefits at that time.

This ignores that the reason for acquiring "insurance in the first place [is] so as not to suffer such anxiety, fear, stress, and uncertainty. The fact that an insurer finally pays in full does not erase the distress caused by the bad faith conduct." *Demetre*, 527 S.W.3d at 33 (quoting *Goodson v. American Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 417 (Colo. 2004)). Furthermore, this holding is directly contrary to the scope of compensable emotional injuries in a bad faith claim laid out in *Knotts*.

The only real justification the majority Opinion offers is by citing to Grundy's testimony that he had begun to receive some retirement and supplemental income by the time he filed suit. The majority concludes that this served as a replacement of sorts for the wrongfully denied short-term disability benefits and that any "financial stress" he had experienced was necessarily alleviated. However, here again, the majority relies upon its characterization of Grundy and Dr. Voor's testimony as unequivocally conceding any related stress was confined to that year, making no note of their clear testimony the trial court could reasonably construe to the contrary.

The majority's directive to the trial court on remand effectively bars the jury from any consideration of the fact that Grundy did not receive $13,061.81

that he should have received in 2013, or could even feel certain he would receive

it, until the agreed judgment and payment by MetLife into the registry occurred,

nine years later, in 2022.  Whatever actions Mr. Grundy had to take to adjust his

budget, or funds he had to expend that he may not have had to use otherwise to

meet his bills, had still not been reimbursed.  And to the extent that caused *any*

stress in his day-to-day life, he is certainly entitled to seek an award of

compensation for it, pursuant to *Demetre* and *Knotts*.

The majority considers the "most egregious error" in the trial court's

compensatory damages instruction to be the inclusion of a "not to exceed"

limitation amount.  The majority acknowledges that MetLife raised no objection as

to the inclusion of the limitation amount in the jury instructions.  FN8 of the

Opinion notes:

> We are cognizant that MetLife did not raise a specific
> objection to including Grundy's *Fratzke* damages claim
> amount in the final jury instructions.  However, MetLife
> did generally object to the final instructions as presented.
> Regardless, longstanding appellate precedent provides
> that so long as an appellate court confines its review to
> the record on appeal, no rule of court or constitutional
> authority precludes this Court from deciding an issue not
> presented on appeal by the parties.  *Priestly v. Priestly*,
> 949 S.W.2d 594, 596 (Ky. 1997) (citing *Mitchell v. Hall*,
> 816 S.W.2d 183, 185 (Ky. 1991)).

The specific language in *Priestley v. Priestly* cited as support here

merits examination:

At the outset, we will not long tarry to consider the contention that the Court of Appeals had no right to decide the case on an issue not raised on appeal. So long as an appellate court confines itself to the record *Montgomery v. Koch*, 251 S.W.2d 235 (Ky. 1952), no rule of court or constitutional provision prevents it from deciding an issue not presented by the parties *Mitchell v. Hadl*, 816 S.W.2d 183 (Ky. 1991). While **it is widely recognized that appellate courts should be reluctant to engage in such a practice**, their discretion is broad enough to prevent a conclusion that it has been abused.

949 S.W.2d 594, 596 (Ky. 1997) (emphasis added). Furthermore, as stated in

*Mitchell v Hadl*:

Ordinarily, this Court confines itself rather closely to deciding only those issues which the parties present. We take the view that counsel and the courts below have sufficiently identified the issues; that we need not redefine the question in the last stage of the litigation. However, we are constrained by no rule of court or constitutional provision to observe this procedure, and **on rare occasions, the facts mandate a departure from the normal practice. When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law. This is such a case**.

816 S.W.2d at 185.

I find no satisfactory explanation as to why the present matter is "such a case."

Examining the perceived prejudice of the *Fratzke* amounts within jury instructions, the majority notes that, "our courts have held on to the practice of giving juries 'not to exceed' numbers under the guise of CR 8.01(2)." Alongside

this practice is the corollary practice of counsel lodging timely objections to specific "not to exceed" amounts in jury instructions as excessive. This practice is sufficiently customary in Kentucky trial practice for this Court to have found that "failure to specifically object to any 'not to exceed' amounts in jury instructions or tendered proposed instructions waives any later objection that the amounts were excessive." *Morris v. Boerste*, 641 S.W.3d 688, 695 (Ky. App. 2022) (quoting *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 61 (Ky. 2013) (internal quotation marks omitted)). To avoid waiver, a party such as MetLife must make a *specific* objection to the jury instructions or tender proposed instructions reflecting a different award limit. CR 51(3); *see also Gersh v. Bowman*, 239 S.W.3d 567, 574 (Ky. App. 2007) (finding objection of excessive damages to pain and suffering award unpreserved where party failed to make specific objection to the "not to exceed" provision contained in the jury instructions).

While MetLife specifically argues for relief on grounds that the punitive damages award was excessive, nowhere does it assert that the "not to exceed" amounts within the jury instructions influenced the award. Despite its waiver of such an argument, the majority has constructed for it an unrequested workaround.

The majority's assertion that "there is no requirement in Kentucky that trial courts include 'not to exceed' amounts for damages in jury instructions,"

implicitly acknowledges there is likewise no prohibition against the practice. Where our trial courts have "held on to a practice" for which there is no prohibition, and for which a party has full opportunity to lodge its objection, it is difficult to justify the majority's actions today. Especially so where, again, MetLife offered no related argument in either its Appellant or Reply brief as to the "not to exceed" amounts, and the majority concedes no related objection appeared in MetLife's proposed jury instructions.

Here again, the majority has, of its own accord, introduced a can of worms that was never fed to the trial judge and, were it offered to this Court by the appellant, precedent would guide us to disallow. *See Grundy v. Commonwealth*, 25 S.W.3d 76, 84 (Ky. 2000).

## PUNITIVE DAMAGES

The guidepost of the degree of reprehensibility of a defendant's conduct is the "most important indicium of the reasonableness of a punitive damages award[.]" *PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 727 (Ky. App. 2016) (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)). The majority concludes that "the degree of MetLife's reprehensibility is unknown because of the default judgment and the jury was given only MetLife's admission that it acted in bad faith and had no reasonable basis for terminating the remaining thirteen weeks of Grundy's STD benefits."

Here again, the majority ignores the extent and gravity of the "statement of admitted facts" that the jury had been instructed to consider alongside the other evidence of record.

Aside from MetLife's admission that it wrongfully and without reasonable cause terminated Grundy's STD benefits, the jury also heard that MetLife had admitted that it had intentionally misrepresented to Grundy that his claim was subject to ERISA. The jury heard the admission that when MetLife made this misrepresentation, it did so with knowledge that "Grundy would have a difficult time finding qualified counsel to assist him in any subsequent litigation." The jury heard the admitted fact "that MetLife knowingly misrepresented that Mr. Grundy's legal remedies were limited, implying that he could not seek compensatory damage and punitive damages and that he would not be entitled to have his claims heard before a jury in a complete trial."

The jury heard the admitted fact that,"[i]n order to minimize its own liability, and with indifference to Mr. Grundy, MetLife devised a plan to terminate Mr. Grundy's STD wage payments." The jury heard that the admitted misrepresentations as to the applicability of ERISA occurred with MetLife's knowledge that "in the event Mr. Grundy ever filed a lawsuit under ERISA, MetLife would be able to shield its financially motivated self-interest from any meaningful investigation" and that "a jury trial or even a bench trial would be

unavailable[.]" The jury heard the admitted fact that, had MetLife's misrepresentations regarding ERISA been successful, Grundy's "damages would be significantly limited with no compensatory, exemplary or punitive damages available." The jury heard that MetLife had made the admission that its "motivation was driven solely by its own financial interest without any concern for the resulting impact on Mr. Grundy financially, emotionally and medically." The "statement of admitted facts" heard by the jury concluded with MetLife's *own admission* that, "[a]s a direct result of [it]s actions, Mr. Grundy has been and continues to be damaged."

Thus, in the admitted facts alone, there was evidence before the jury that "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others[.]" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). The admitted facts described a plan devised by MetLife which involved multiple actions and representations; this "conduct involved repeated actions" rather than merely "an isolated incident[.]" *Id*. Certainly, the admitted facts alone provided the jury with adequate basis to conclude that *any* harm thereby sustained by Grundy "was the result of intentional malice, trickery, or deceit," rather than by any "mere accident." *Id*. Furthermore, and despite the majority's evaluation thereof, I believe the testimony of Grundy and Dr. Voor was a more than

adequate basis for the jury to conclude that Grundy, "the target" of the admitted plan by MetLife, "had financial vulnerability[.]" *Id.*

Consequently, I disagree with the majority's approach here again, that the jury's punitive damages award may only be attributed to some error in the proceedings which the Appellant has not identified. And the majority again constructs an argument and provides another unrequested ground for relief to MetLife. Here, it concludes the trial court abused its discretion by allowing the testimony of Grundy's expert witnesses, Elliott Flood and Sara Ford.

While the Appellant did at least raise this issue in its pre-hearing statement, there is again not a single word regarding this issue in its Appellant's brief or Reply brief.

Prior to trial, MetLife had sought to exclude both Flood and Ford from offering any testimony pursuant to KRE 702, in motions to exclude filed on October 10, 2022. MetLife primarily argued that Flood was unqualified to testify as an expert based upon his lack of "direct experience with administration of STD claims in the ERISA or non-ERISA group context." Additionally, MetLife argued that it anticipated Flood would testify as to matters which concerned liability rather than damages, that he would offer testimony as to administrative licensing requirements and regulatory compliance which would amount to improper legal conclusions, and that he would offer improper testimony as to MetLife's litigation

conduct. In an order entered on October 21, 2022, the trial court deferred on a final ruling as to Flood's qualifications "until such time as the Plaintiff demonstrates, outside of the presence of the jury, Mr. Flood's qualifications through sworn testimony[.]"

Flood was examined before the trial court as to his qualifications in a short hearing just prior to the jury hearing his testimony. Following Flood's cross-examination, MetLife made no challenges as to the substance of his opinions. MetLife cited to *Farmland Mutual Insurance Co. v. Johnson*, 36 S.W.3d 368 (Ky. 2000). After hearing arguments, the trial court concluded that Flood had the necessary experience and qualifications to testify as an expert in the case.

The majority complains that Flood "admitted that he had no experience adjusting STD claims." However, the majority find abuse of discretion not as to the trial court finding Flood's qualifications were adequate. The majority finds error in the admission of opinions, the subject matter of which the majority finds "distorted" and irrelevant. However, MetLife never presented any challenge as to the substance of Flood's opinions until after his testimony. This did not occur until MetLife's motion for a mistrial on the morning of the second day of trial, the stated grounds for which included the opinions of Flood as to profitability.

Grundy argued that Flood's opinions were disclosed in his expert disclosure but that during MetLife's deposition of Flood it had chosen not to

-85-

inquire as to his opinions regarding profitability. The trial judge stated that MetLife made no timely objections to the testimony as it came in. It found the motion for mistrial untimely as well and denied.

I strongly disagree that the trial court abused its discretion here, especially as trial courts have wide discretion to admit or exclude testimony, particularly expert testimony. *See, e.g.*, *Jones v. Stern*, 168 S.W.3d 419, 424 (Ky. App. 2005). Neither do I discern any abuse of discretion as to the trial court's rulings regarding Grundy's expert Sarah Ford.

MetLife filed a motion to exclude the testimony of Sarah Ford on October 10, 2022. The argument focused upon a calculation based upon the original damages award in the default judgment. The trial court, in an October 21, 2022, order, did grant that "Ms. Ford's one opinion regarding the amount of the default judgment is excluded from trial based on the Court's ruling that this evidence is not admissible" but otherwise denied MetLife's motion to exclude her testimony entirely.

During arguments on MetLife's Motion for a Mistrial, MetLife reiterated its objection to Ford testifying as to any calculation of Grundy's potential long-term disability benefits.

The majority finds Ford's testimony "had similar flaws" to that of Flood. The majority's first complaint is that she testified as to the LTD insurance

policy without the contract being entered into evidence as an exhibit. The majority notes that MetLife cross-examined Ford as to terms and conditions of the policy without the jury being able to review the policy itself during deliberations. The majority finds this "totally contrary to *Deskins*."

I see no reason that *Deskins* requires the jury to review the LTD benefits plan to award punitive damages here.

*Deskins* concerned a default judgment rendered as to liability on a complaint which had originally alleged breach of a construction contract. 314 S.W.3d at 301. We noted that, as the initiating complaint clearly stated that it was based upon a construction contract, any damages that followed were entirely derivative of the terms and conditions of the construction contract. 314 S.W.3d at 304. However, at the evidentiary hearing on damages, despite her being the beneficiary of the default judgment as to liability and the factual allegations of the initiating complaint being deemed admitted, Estep (plaintiff in the original action) gave testimony which directly contradicted and inflated the contractual costs of construction which had been stated in the complaint. *Id*. at 305. Furthermore, Estep testified at the evidentiary hearing that she had herself never actually entered into any construction agreements with Deskins and had no ownership interest in the property that was the subject matter of the litigation. *Id*. at 304. No construction contract had been attached to the complaint nor was it otherwise made

part of the record in the case. *Id*. While Estep presented expert testimony as to damages, that expert testified he was unaware of any construction agreements between the parties. *Id*.

Here, there is no assertion that Grundy's testimony contradicted or otherwise called into question any matter concerning the LTD agreement which had been deemed admitted as a result of the default. Furthermore, no testimony of Grundy's expert witnesses called into question the existence of the LTD agreement or its material terms, or otherwise contradicted facts deemed admitted as a result of the default. While the majority takes great issue with the calculations of Ford, it specifies no material term of the LTD benefits plan that was disputed or mischaracterized to the jury.

During cross-examination of Ford, counsel for MetLife presented her with the LTD contract and questioned her regarding a provision which limited the period of payments for some mental disorders. Ford was questioned as to another provision imposing other limitations in some situations when the beneficiary received other sources of income as a result of the same diagnosis that triggered LTD benefits. On redirect examination, Ford read from a record which indicated ischemic heart disease was the primary diagnosis for which Grundy received social security disability benefits. During closing statements, Grundy offered additional

arguments as to why any provisions from the LTD contract which would have effected Ford's calculations were otherwise inapplicable.

I see no indication that any material terms of the LTD contract were in dispute in this case. Any dispute concerned the proper *interpretation* of the provisions. Generally, the interpretation of a contract is a question of law for the courts. *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App.. 2002). The majority has identified no provision of the LTD contract as ambiguous, or an area of dispute concerning extrinsic evidence that would render construction of the LTD contract an appropriate subject of resolution by the factfinder. *Id.* (citing *Cook United, Inc. v. Waits*, 512 S.W.2d 493, 495 (Ky. 1974); *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 18 (Ky. 1953); *Lagrew v. Hooks–SupeRx*, 905 F.Supp. 401, 404 (E.D. Ky. 1995)).

MetLife introduced the provisions into evidence but made no attempt to submit the LTD contract to the jury. MetLife could have requested the trial court rule upon interpretation of provisions *in limine* but chose not to do so. I see no reason *Deskins* required Grundy to submit the LTD contract to the jury in this instance.

The majority recognizes that Ford was subject to extensive cross-examination as to her calculations of the value of the LTD. Additionally, MetLife presented extensive testimony from its own expert witnesses, who testified about

the terms and conditions of the LTD benefits plan. The majority finds the jury would have benefited from reviewing and sorting out the terms and conditions of LTD benefits plan but gives no indication MetLife had been prevented from introduction of the LTD contract as an exhibit for the jury.

And yet the majority Opinion goes so far as to not only direct that Grundy's expert witnesses' testimony must be excluded from his next trial, but to also *sua sponte* mandate additional limits on the award of punitive damages in the jury instruction: "If the trial court allows a punitive damage instruction, evidence regarding KRS 411.186(2) shall be limited to profit, if any, that MetLife may have gained from Grundy's LTD benefits only, assuming the evidence establishes that those benefits were wrongly denied." (Majority Opinion, pg. 29.)

This degree of overreach by an appellate court goes too far. First of all, Grundy's complaint did not say he had been wrongly denied long term disability payments. What it alleged, what the jury was instructed to accept as fact, was:

> 41.     Based upon its contract with American Red
> Cross, MetLife had a financial incentive to keep
> American Red Cross-by minimizing American Red
> Cross's financial liability for STD wage payments,

> 42. MetLife also had a separate financial interest-
> its own financial liability under another insurance policy.

> 43.     MetLife insures Mr. Grundy under a long
> term ("LTD") insurance policy designed to dove-tail with

-90-

his STD wage payments should he remain disabled and unable to perform the duties of his own job.

44.     If it agreed that Mr. Grundy was unable to perform all of the duties of his own job, MetLife risked significant liability under the LTD policy.

45.     In order to minimize its own liability, and with indifference to Mr. Grundy, MetLife devised a plan to terminate Mr. Grundy's STD wage payments.

46.     As part of this plan, MetLife determined it would terminate Mr. Grundy's STD wage payment at the earliest juncture with the hope that he would not ever file a claim under the LTD policy.

47.     As part of this plan, MetLife misled Mr. Grundy concerning his legal rights representing that his STD wage payments were subject to ERISA.

(Complaint, pg. 5 of the trial record.)

So, while there is nowhere in MetLife's brief where it argues why the testimony given in this trial by Mr. Flood and Ms. Ford, Grundy's expert witnesses, should have been excluded from the trial, the majority has nonetheless provided the arguments for MetLife, largely where MetLife never presented corollary arguments to the *trial court*. And further, without any opportunity for Grundy to respond, the majority has now determined that the trial court abused its discretion. And by its command that any punitive damage instruction be limited to, "[P]rofit, if any, that MetLife may have gained from Grundy's LTD benefits only, assuming the evidence establishes that those benefits were wrongly denied[,]" the majority

completely undermines the admitted facts of this case and the very purpose of KRS 411.186(2).

Admitted facts of this case that the jury was instructed to consider include MetLife's concoction of a plan to deter Grundy from even applying for LTD benefits; in furtherance of this plan, it terminated his STD benefits early and without cause. Additionally, MetLife intentionally misinformed Grundy that the STD plan was covered by ERISA to deter any attorney from accepting his case and to deter Grundy from pursuing his legal rights. And the long-understood purpose of punitive damages is to "punish a defendant, deter future wrongdoing, and express [the jury's] moral condemnation." *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 64 (Ky. 2018) (citation omitted). KRS 411.186(2)(c) calls for considering the *profitability* of the misconduct to the defendant ─ not the precise *profit*. By implementation of its requirement that evidence in the next trial regarding KRS 411.186(2) be limited to profit, if any, that MetLife may have gained by denying LTD benefits to Mr. Grundy, but only after the evidence establishes that the LTD benefits were wrongfully denied, the majority usurps the jury's proper consideration of the case's admitted facts as a basis by which they may assess reprehensibility. By extension, the jury's full ability to render a damages award in order to "punish a defendant, deter future wrongdoing, and express [its] moral condemnation" is foreclosed; its message to other bad actors

considering such a reprehensible course of action, which it would otherwise issue, remains unsent.

And by prefacing this requirement with the language "*if* the trial court allows a punitive damage instruction . . ." (emphasis added), the majority Opinion enters the realm of self-contradiction. There is little clear path to reconcile this statement with the Opinion's earlier passage where it rightly held, "[i]n this case, MetLife's liability was established by default, resulting in an admission of bad faith and reckless conduct in terminating Grundy's STD benefits. **Under these facts, Grundy was entitled to a punitive damage award instruction**. *Wittmer v. Jones*, 864 S.W.2d 885, 891 (Ky. 1993)." (Majority Opinion, pg. 23) (emphasis added).

The majority Opinion presents a tangled procedural riddle for the trial court to unravel upon retrial. Moreover, it presents an unclear path for other trial courts as to the appropriate treatment of admitted facts in evidentiary hearings which follow an unjustified default as to liability, and as to the inclusion of *Fratzke* amounts within jury instructions where no objection has occurred. Future appellants may weigh the benefits of foregoing a difficult argument entirely, in hopes this Court will *sua sponte*, uncover a basis for reversal we might otherwise reject with the benefit of guidance from counsel. Most of all, the majority's Opinion fails to credit the trial judge's discretion, greater familiarity with the

evidence, opportunity to assess what evidence to admit or exclude, and reasons therefor.

BRIEFS FOR APPELLANT:

Ariela C. Anhalt
Jonathan M. Freiman
New Haven, Connecticut

Bethany A. Breetz
Chadwick Aaron McTighe
John Lewis Tate
Louisville, Kentucky

BRIEF FOR APPELLEE:

Michael D. Grabhorn
Andrew M. Grabhorn
Louisville, Kentucky